# United States Court of Appeals
## For the First Circuit

Nos. 21-1045 & 21-1616

ADEKUNLE OLUWABUMWI ADEYANJU,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General of the United States,

Respondent.

PETITIONS FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Thompson, Hawkins,* and Barron,
Circuit Judges.

SangYeob Kim, with whom Ronald L. Abramson, Emily Assunta White, Shaheen & Gordon P.A., Gilles Bissonnette, Jennifer Lyon, and American Civil Liberties Union of New Hampshire, were on brief, for petitioner.

Lindsay Corliss, Trial Attorney, Office of Immigration Litigation, with whom Brian Boynton, Acting Assistant Attorney General, Civil Division, John S. Hogan, Assistant Director, Office of Immigration Litigation, and Kiley Kane, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

* Of the Ninth Circuit, sitting by designation.

February 24, 2022

**THOMPSON**, **Circuit Judge**.  When the Board of Immigration Appeals ("BIA") considers an appeal, it is bound, as we are, by certain standards of review.  It reviews factual findings of an Immigration Judge ("IJ") only for clear error.  But it is free to conduct discretionary-relief determinations based on those factual findings afresh without any deference to the IJ's conclusion.  In today's case, the primary question is where the line lies between an IJ's factual finding, reviewed for clear error, and a discretionary judgment call, reviewed by the BIA de novo.  We must consider if the BIA properly applied clear-error review to truly factual findings.  We also consider whether the BIA erred in refusing to remand this case to the IJ.  Agreeing with some, but not all, of the petitioner's contentions, we grant only in part one of the petitions for review.

## BACKGROUND

We begin by exploring how the parties got here, taking the facts from the administrative record, including Petitioner Adekunle Oluwabumwi Adeyanju's testimony before the IJ.  See Martínez-Pérez v. Sessions, 897 F.3d 33, 37 n.1 (1st Cir. 2018).

Adeyanju is a native and citizen of Nigeria who entered the United States on March 7, 2013, using a B-2 tourist visa.[1]  He has resided here ever since, now residing in Maine.

---

[1] A "B-2 visa" is available, for example, to "tourists and those coming for social visits, health reasons, or participation

Before his arrival from Nigeria, he submitted at least two applications for a visa, one in 2010, the other in 2011. In each, Adeyanju represented that he had a live-in domestic partner in Nigeria to whom he was engaged. Within a month of his arrival here, though, Adeyanju met, via an online dating site, Miranda Raymond, who seven months later, in the autumn of 2013, would go on to become his first U.S.-citizen wife. About six months after his marriage, Adeyanju was granted conditional resident status based on his marriage to a U.S. citizen. The couple subsequently filed a joint I-751 petition to remove the conditions of his residency.[2]

Before the I-751 petition was adjudicated, though, the marriage apparently deteriorated and by 2015, Adeyanju was no longer living with Raymond. Instead, he was residing with Rebecca Dyer, whom he said was, at that time, his roommate. During their time together, Rebecca became pregnant with Adeyanju's child, who was born in April 2016.

---

in amateur music and sports events." 1 Charles Gordon et al., Immigration Law and Procedure § 1.03 (2021). It doesn't permit employment while in the U.S., and it ordinarily stays valid for at least six months. Id.

[2] An "I-751 petition" is immigration lingo for the form filed jointly by a U.S.-citizen spouse and their qualifying immigrant spouse to remove the conditional basis of the immigrant spouse's residency. See 4 Gordon et al., supra, § 42.04; see also 8 U.S.C. § 1186a(c). It is filed within the 90-day window before the second anniversary of the immigrant spouse's obtaining conditional residency. 8 C.F.R. § 216.4(a)(1).

Also in 2014 and 2015, a number of police reports in Maine were generated for Adeyanju's behavior towards women. In short, on at least six occasions, Adeyanju was reported as engaging in harassing or suspicious behavior towards women as young as seventeen. Women reported that Adeyanju approached them in public places and asked them personal questions, including whether they were in high school. He requested their phone numbers or solicited them to go out with him, persisting even after the women declined. Nevertheless, none of these incidents resulted in any arrests or charges.

In January 2018, the United States Customs and Immigration Service ("USCIS") notified Adeyanju and Raymond that it intended to deny their jointly filed I-751 petition and did so in May 2018.[3] In issuing the denial, USCIS reasoned that Adeyanju intended to commit marriage fraud with Raymond. To support its finding, USCIS relied on the separate living arrangements, records of Adeyanju's police encounters involving other women, and evidence suggesting there was not a "bona fide familial relationship," including: the lack of knowledge about each spouse's finances, activities, or personal relationships; the

_____

[3] When USCIS finds potential evidence that the marriage was not bona fide, it may issue a "notice of intent to deny" the petition, then giving the immigrant the opportunity to rebut the information before issuing the formal denial. 4 Gordon et al., supra, § 42.06.

failure to file joint tax returns; their failure to go on shared trips or participate in shared activities; and Adeyanju's relationship and child with Rebecca. Additionally, according to USCIS, Raymond told the officer at an interview that Adeyanju lied to her about why he was marrying her -- not for love, but rather, to gain an immigration benefit. After the notice of intent to deny was issued, Raymond disputed USCIS's assertion that she told a USCIS officer that Adeyanju lied about their marriage and claimed that the officer had twisted her statements. But USCIS was unconvinced and rejected Raymond's explanation in the final denial. The same day the I-751 denial was issued, the Department of Homeland Security ("DHS") initiated removal proceedings against Adeyanju.

Three months later, Adeyanju divorced Raymond. And two months after that, he married Rebecca -- a U.S. citizen and mother of Adeyanju's U.S.-citizen child. Rebecca then filed an application for adjustment of Adeyanju's status on the basis of their marriage and an I-751 waiver petition.[4]

_____

[4] An "I-751 waiver" refers to the procedure established in 8 U.S.C. § 1186a(c)(4). As discussed, an immigrant typically files her I-751 petition jointly with her U.S. citizen spouse. But Congress recognized that some good-faith marriages nonetheless still break down. See Gordon et al., supra, § 42.05. So § 1186a(c)(4) sets forth an option for the Secretary of Homeland Security to, in her discretion, waive the requirement that the I-751 petition be filed jointly if the immigrant can establish certain grounds for relief. As relevant here, one of those grounds is that the qualifying marriage "was entered into in good faith

- 6 -

Not long before the new application was filed, Adeyanju was arrested in Maine. A woman reported that Adeyanju drove her home from a local bar because she was too drunk to drive. And she reported that, on the way to her home, Adeyanju pulled the car over and raped her. Initially, when the police approached Adeyanju regarding the allegations, he flat-out denied having sexual intercourse with the victim. Adeyanju told police that he was married and was on medication that prohibited him from having sexual intercourse. Later, though, the victim participated in a sexual-assault evidence collection procedure, which revealed physical evidence of sexual intercourse and which harvested a DNA sample of the assailant. Armed with a search warrant for a sample of Adeyanju's DNA, police were able to match Adeyanju's DNA to the sample collected. As a result, Adeyanju was indicted for kidnapping, as well as two different counts of sexual assault.

## LEGAL PRIMER

Given the quirkiness of immigration law, before we explore the proceedings before the BIA and IJ, we will begin with a primer on some relevant legal principles to offer some context.

The BIA's regulations set up a procedural hierarchy for immigration proceedings. Within that hierarchy, the IJ and BIA

---

. . . but . . . has been terminated . . . and the [immigrant] was not at fault" in failing to file the joint petition. 8 U.S.C. § 1186a(c)(4)(B). The marriage at issue in the I-751 waiver, though, is Adeyanju's marriage to Raymond, not Rebecca.

have different, but sometimes overlapping, roles. "The IJ has the front-line duty of finding the facts." Chen v. Holder, 703 F.3d 17, 22 (1st Cir. 2012). On appeal, the BIA's review of the IJ's factual determinations is circumscribed by regulation. BIA regulations at the time of the appeal provided that the BIA is prohibited from "engag[ing] in factfinding in the course of deciding appeals." 8 C.F.R. § 1003.1(d)(3)(iv) (2020). The BIA "will not engage in de novo review of findings of fact determined by an immigration judge." Id. § 1003.1(d)(3)(i). Rather, "[f]acts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." Id.

To find clear error as to the IJ's findings of fact, the BIA must be "left with the definite and firm conviction that a mistake has been committed." Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 Fed. Reg. 54878-01, 54889 (Aug. 26, 2002) [hereinafter "BIA Reforms"]. "A factfinding may not be overturned simply because the [BIA] would have weighed the evidence differently or decided the facts differently had it been the factfinder." Id. Or, as we've put it, see id. (noting the regulation's clear-error standard mirrors that employed by the courts of appeals in non-immigration cases), to show clear error a challenger "must show that the contested

finding stinks like 'a 5 week old, unrefrigerated, dead fish,'" United States v. Baptiste, 8 F.4th 30, 42 (1st Cir. 2021) (quoting United States v. Rivera-Carrasquillo, 933 F.3d 33, 42 (1st Cir. 2019)). To demonstrate clear error, one "must do more than show that the finding is 'probably wrong,' for [a court] can reverse on clear-error grounds only if -- after whole-record review -- [it] ha[s] 'a strong, unyielding belief' that the judge stumbled." Rivera-Carrasquillo, 933 F.3d at 42 (quoting Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013)).

When it comes to questions of law, discretion, and judgment, though, the BIA has the authority to review those determinations of the IJ de novo. 8 C.F.R. § 1003.1(d)(3)(ii) (2020).

"Adjustment of status," the application at issue here, "is a matter of grace, not of right, and the evaluation of such applications is left to the discretion of the Attorney General." Wallace v. Gonzales, 463 F.3d 135, 137 (2d Cir. 2006); see 8 U.S.C. § 1255(a). There are no "restrictive guide lines for the exercise of discretion." Matter of Arai, 13 I. & N. Dec. 494, 495 (BIA 1970). In general strokes, the Attorney General (or her designee in the IJ or BIA) balances the negative equities weighing against, and the positive equities favoring, an exercise of administrative discretion. See id. at 495-96. In weighing those equities, the BIA may "assign the weight it sees fit" to them. Alimbaev v. Att'y

- 9 -

Gen. of the U.S., 872 F.3d 188, 200 n.10 (3d Cir. 2017); see BIA Reforms, 67 Fed. Reg. at 54890 ("[T]he weight accorded to individual factors . . . may be reviewed by the Board de novo."). The petitioner bears the burden of demonstrating in her removal proceeding that she satisfies the eligibility requirements and merits a favorable exercise of discretion. 8 U.S.C. § 1229a(c)(4)(A); 8 C.F.R. § 1240.8(d).[5] As a discretionary call, the BIA's review of an IJ's decision granting or denying adjustment of status is de novo. 8 C.F.R. § 1003.1(d)(3)(ii) (2020).

In deciding appeals, the BIA is bound to follow its own regulations. See Rotinsulu v. Mukasey, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations."); see also 8 C.F.R. 1003.1(d)(1) (2020) ("The Board shall resolve the questions before it in a manner that is . . . consistent with the Act and regulations.").[6] Whether an agency

---

[5] Neither the statute nor the regulation clarifies what exactly that burden entails. See, e.g., Chaidy v. Holder, 458 F. App'x 506, 509 (6th Cir. 2012) (noting that the statute requires the immigrant "to prove his eligibility for relief from removal, such as adjustment of status, by some unspecified burden"); 4 Gordon et al., supra, § 51.05 (noting that "the extent of th[e] burden has not always been clear").

[6] The applicable regulations were amended effective January 15, 2021. But they "apply only to appeals filed, motions to reopen or reconsider filed, or cases remanded to the Board by a Federal court on or after the effective date of the final rule." Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588, 81588 (Dec. 16, 2020). The parties do not clarify whether 8 C.F.R. § 1003.1(d)'s legal standards concerning factfinding used in deciding the initial appeal applies, or whether, in deciding the motions to reconsider

fails to follow a regulation raises a question of law. <u>Lumataw</u> v. <u>Holder</u>, 582 F.3d 78, 85 (1st Cir. 2009). And if we determine the agency failed to follow the regulations, we may vacate and remand. <u>See</u> <u>Rotinsulu</u>, 515 F.3d at 72. With those principles in the backdrop, we forge on.

## PROCEEDINGS BELOW

### I. The IJ's Decision

After a hearing before an IJ at which Adeyanju testified, the IJ granted the application for adjustment of status. The IJ surveyed the record and determined that Adeyanju had a number of positive equities weighing in his favor. He had been in the United States for seven years; has a U.S.-citizen daughter; is gainfully employed and pays his taxes; and has other family ties in the United States, including two lawful-permanent-resident sisters and a U.S.-citizen brother. The IJ also found that Adeyanju was a credible witness and was candid about his criminal record.

The IJ then considered the negative equities weighing against discretionary relief as argued by the government's counsel. He first began by finding that Adeyanju did not commit

---

and reopen filed after January 15, 2021, the BIA had to employ the new standard articulated in the amended § 1003.1. In any event, we assume the 2020 version of § 1003.1 applies here because implementation of the 2021 amendments is currently enjoined. <u>See</u> <u>Centro Legal de la Raza</u> v. <u>Exec. Office for Immigr. Rev.</u>, 524 F. Supp. 3d 919, 980 (N.D. Cal. 2021); <u>see also</u> <u>James</u> v. <u>Garland</u>, 16 F.4th 320, 323 n.2 (1st Cir. 2021).

fraud in the visa-application process in Nigeria where he stated that he was engaged to his live-in girlfriend. Rather, the IJ concluded, Adeyanju's explanation of the circumstances concerning his supposed engagement and the resulting answers he gave on the application were reasonable.[7]

Second, the IJ reviewed the evidence of purported marriage fraud, concluding the evidence was "inconclusive." According to the IJ, there was evidence refuting DHS's argument that Adeyanju intended to commit marriage fraud with his marriage to Raymond. Ultimately, the IJ said that "there is some evidence of fraud in the previous marriage [to Raymond] in the notice of intent,"[8] and the IJ thus "place[d] some weight on the notice of

---

[7] At the hearing before the IJ, Adeyanju explained that the mix-up here is rooted in cultural differences between the United States and Nigeria. He explained that he was living with a girlfriend and they intended to "go to [the] next level, but things didn't work out."

[8] As a refresher, those details are: separate living arrangements; records of Adeyanju's police encounters involving other women; and evidence suggesting there was not a "bona fide familial relationship" (including the lack of knowledge about each spouse's finances, activities, or personal relationships; the failure to file joint tax returns; their failure to go on shared trips or participate in shared activities; and Adeyanju's relationship and child with Rebecca).

Adeyanju did not object to the information contained in USCIS's denial letter being used as evidence. In any event, almost all the information concerning the alleged indicia of marriage fraud contained in the notice (save the information about joint activities and trips) is corroborated by other evidence in the Administrative Record.

- 12 -

intent to terminate."[9]  Still, he found the evidence of fraud in the prior marriage "inconclusive."  The IJ further concluded that Adeyanju's having a child out of wedlock was "evidence of immoral and bad behavior."

Third, the IJ went on to review Adeyanju's criminal record, including a dismissed charge for operating under the influence.  On the subject of his police encounters resulting from his behavior with young women, the IJ said that "[t]here is insufficient evidence" that any behavior like that has occurred since 2016.  This behavior, which the court called "creepy," was given "some negative weight."  As to the pending charges for kidnapping and sexual assault, the IJ took them into consideration but noted that Adeyanju testified before the IJ and "admit[ted] his behavior, and . . . assert[ed] a consent defense."[10]

Ultimately, the IJ found that the positive equities outweighed the negative equities.  So he granted the application for adjustment of status.  As for the pending I-751 waiver, at a pre-hearing conference Adeyanju had told the IJ that the hearing on the adjustment-of-status application shouldn't be held up to

---

[9] We note that the IJ appears to be referring to USCIS's final denial of Adeyanju's joint I-751 petition with Raymond and not USCIS's pre-denial notice of intent to deny.

[10] Based on a blood draw from the victim on the night of the alleged rape, the crime lab estimates that her blood alcohol content at the time of the alleged rape would've been about 0.17%.

wait for the I-751 waiver to be adjudicated by USCIS. Specifically, the IJ had asked Adeyanju's counsel at an earlier hearing: "[I]f the 751 waiver has not been adjudicated by [the date scheduled for the adjustment-of-status hearing], will you be ready to go forward . . . ?" To which Adeyanju's counsel responded: "Yes." So the IJ didn't consider it because when he issued his ruling on Adeyanju's adjustment-of-status application, the I-751 waiver wasn't ripe as USCIS had not made a final decision on it.

## II. DHS's Appeal

Unhappy with the IJ's decision, DHS appealed to the BIA. In its final decision, the BIA noted that it reviewed discretionary calls de novo and factual findings for clear error. It then pronounced its disagreement with the IJ's determination that the positive equities outweighed the negatives. After recognizing the same positive equities the IJ considered, the BIA took a deep dive into the adverse factors. The BIA began by rehearsing the "documented history of predatory and criminal behavior towards women and adolescent girls." According to the BIA, the IJ "erroneously found that . . . there was no evidence that [Adeyanju] had engaged in similar behavior since" 2016. Instead, the BIA observed, "the record reflects that [Adeyanju]'s behavior may have instead escalated," referring to his pending charges for kidnapping and sexual assault. The BIA also stated that the IJ

- 14 -

failed to "mention [Adeyanju] lied to the police to avoid responsibility, and instead [the IJ] focused on the fact that [he] eventually admitted that he had sex with the victim." The BIA concluded that, even though Adeyanju hadn't been convicted of any crimes, it could still consider the fact that "he lied to the police" and that Adeyanju's "dishonesty regarding his conduct is indicative of bad character and is a serious negative factor."

The BIA also regarded as an additional negative factor the "indicia of past immigration fraud." The BIA stated that Adeyanju "inaccurately claimed that he was engaged to a woman in Nigeria" on his visa application. The BIA further recounted the history with his first wife, Raymond, and noted that the IJ found the evidence of marriage fraud was "inconclusive."

Weighing these negative factors against the positive ones, the BIA concluded that Adeyanju failed to show that he merited adjustment of status. The BIA thus sustained the appeal and ordered Adeyanju removed. At the same time, it acknowledged Adeyanju had a pending I-751 waiver but said nothing else about it. Adeyanju petitioned for our review.

## III. Subsequent BIA Decisions

Soon after the first petition for our review was filed, Adeyanju filed timely motions to reconsider and reopen with the BIA. The BIA denied those motions in August 2021. The BIA rejected Adeyanju's legal contention that it had made improper findings of

- 15 -

fact, reasoning instead that it had only reweighed the positive and negative factors and reached a determination different than the IJ's. As to the pending I-751 waiver, the BIA said there was no need for a remand to the IJ because the IJ still lacked jurisdiction over the still unadjudicated petition. And, it stated, regardless, Adeyanju failed to make out a prima facie case of eligibility for I-751 waiver relief, notwithstanding Adeyanju's assertion that it was "undisputed that [he] is prima facie eligible." The BIA gave no explanation for its determination of ineligibility. Unsuccessful a second time, Adeyanju filed another petition for our review of the BIA's denial of his motions to reconsider and reopen, and here we are.

## JURISDICTION

We begin by checking our jurisdiction. For petitions for review of BIA decisions, our jurisdiction is circumscribed by statute. Under 8 U.S.C. § 1252(a)(2)(B), we typically lack jurisdiction to review the BIA's discretionary remedy of adjustment of status. See Tacuri-Tacuri v. Garland, 998 F.3d 466, 471 (1st Cir. 2021); see also Peulic v. Garland, 22 F.4th 340, 346 (1st Cir. 2022). But as a general proposition, we have jurisdiction over petitions that raise "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D); see Tacuri-Tacuri, 998 F.3d at 471.

In both of his petitions, Adeyanju argues that the BIA committed two legal errors in adjudicating his appeal. First, he says that the BIA engaged in impermissible de novo factfinding, which it isn't allowed to do under its regulations. See 8 C.F.R. § 1003.1(d)(3)(i) (2020). And second, he argues that the BIA should have remanded the case to the IJ for further factfinding and consideration of his pending I-751 waiver before entering a final order of removal.

The government, for its part, contends that we lack jurisdiction over Adeyanju's first petition (from the initial appeal) because his claims are mere attacks on the BIA's discretionary decisions cloaked in question-of-law garb. The government does not appear to dispute, though, that, in general, if the BIA failed to appropriately apply clear-error review (as Adeyanju presses it did) then we would retain jurisdiction over the first petition. Indeed, we have held that if "the BIA has 'departed from its settled course of adjudication' in the process of making a discretionary determination," we have jurisdiction to review a petition claiming such a legal error. Perez-Trujillo v. Garland, 3 F.4th 10, 22 (1st Cir. 2021) (quoting Thompson v. Barr, 959 F.3d 476, 490 (1st Cir. 2020)); see Peulic, 22 F.4th at 346 (claims that the agency applied the incorrect legal standard make out questions of law over which we have jurisdiction); accord, e.g., Duncan v. Barr, 919 F.3d 209, 213 (4th Cir. 2019) ("Whether

- 17 -

the BIA has applied the proper standard of review is a question of law for purposes of our jurisdiction."); Huang v. Holder, 677 F.3d 130, 135 (2d Cir. 2012) (holding the BIA's failure to apply clear-error review is a question of law for which § 1252 provides jurisdiction). Just as a petitioner may not cloak her attacks on discretion in question-of-law garb, "[t]he BIA cannot reverse an IJ's findings and cloak its actions in the euphemistic language of reweighing." Zhou Hua Zhu v. U.S. Att'y Gen., 703 F.3d 1303, 1315 (11th Cir. 2013).

On Adeyanju's second petition (coming from the denial of his motions to reconsider and to reopen), the government does not dispute that we have jurisdiction to review the BIA's denial of those motions. See Saka v. Holder, 741 F.3d 244, 249 & n.3 (1st Cir. 2013) (motions to reconsider); Mazariegos v. Lynch, 790 F.3d 280, 285 (1st Cir. 2015) (motions to reopen).

There is, however, another jurisdictional wrinkle lying latent here. Another component of our jurisdiction over petitions for review in immigration cases is that the petitioner must have exhausted all of her administrative remedies. See 8 U.S.C. § 1252(d)(1). We have suggested in a case raising alleged impermissible factfinding by the BIA that such a claim "is unexhausted unless and until the [petitioner] files a timely motion asking the BIA to reconsider its actions." Meng Hua Wan v. Holder, 776 F.3d 52, 57 (1st Cir. 2015). This exhaustion requirement, we

- 18 -

opined, "is jurisdictional; that is, it constitutes a limitation on our power of review." Mazariegos-Paiz v. Holder, 734 F.3d 57, 62 (1st Cir. 2013). Though the government has not argued that Adeyanju failed to exhaust his administrative remedies here, this requirement cannot be waived. See García-Cruz v. Sessions, 858 F.3d 1, 7 (1st Cir. 2017).

Tackling the flaw with his first petition head on, Adeyanju in his second petition contends that we have jurisdiction over his first petition for review notwithstanding that it came before he filed a motion to reconsider or reopen because his case is distinguishable from Meng Hua Wan. As he sees it, because he told the BIA in the initial appeal's briefing that it was bound by the clear-error standard, that passing mention to the appropriate standard of review sufficed to exhaust that issue in the first petition. But we need not decide whether his distinction carries the day because Adeyanju ultimately did file a timely motion to reconsider to the BIA arguing that it engaged in impermissible factfinding and petitioned for review from the BIA's denial of that motion. Thus, Meng Hua Wan's exhaustion requirement, assuming it does apply here, has been met. We therefore have jurisdiction to consider those clear-error-standard-violation arguments made in

the motion to reconsider raised in the second petition, and we will ultimately dismiss his first petition as moot.[11]

In considering his second petition, though, we note that the petition re-raises almost all the same legal issues from the first petition (save for the BIA's failure to explain its reasoning, which we'll get to below) and supplements the arguments on those issues, incorporating by reference the arguments made in his briefs in the first petition.  As such, we see no reason not to address the various legal arguments Adeyanju made in both sets of briefs on all issues over which we have jurisdiction.

Bottom line, after reviewing the record and examining Adeyanju's claims, we conclude his petition presents questions of

---

[11] The government also does not argue that any of the failure-to-remand arguments (which we'll get to later) are not exhausted. And though the government contends (separate from an exhaustion argument) that the BIA did not address one of Adeyanju's arguments, see infra II.C., because he didn't raise it until his reply brief, the government points to no authority suggesting that an argument raised for the first time in a reply brief at the BIA isn't enough to exhaust administrative remedies on that issue. See Singh v. Gonzales, 413 F.3d 156, 160 n.3 (1st Cir. 2005) (concluding an issue raised even "in a perfunctory manner" before the BIA was exhausted); see also Toledo v. Gonzales, 467 F. App'x 723, 724 (9th Cir. 2012) (finding issue exhausted where it was raised in the reply brief to the BIA).  And we have not identified any, either.  Additionally, the government below did not object to Adeyanju's filing of the reply brief, and the BIA did not tell us that it was not considering the reply brief.  See BIA Practice Manual § 5.4 (2020) (providing only for an opening brief and a brief in opposition, but not a reply); see also id. § 4.6(h) (providing that, in deciding an appeal -- not a motion -- the BIA "does not normally accept" reply briefs and requiring the party file a motion meeting certain requirements to file a reply brief).

law, and we have jurisdiction to consider the issues exhausted by the motions to reconsider and reopen.[12]

## DISCUSSION

## I.  Whether the BIA Engaged in De Novo Factfinding

Adeyanju argues that the BIA committed legal error when it failed to employ the clear-error standard of review to the IJ's adjustment-of-status fact findings and thus erred in denying his motion to reconsider on this ground.

We review the BIA's denial of Adeyanju's motion to reconsider for abuse of discretion.  See Dimova v. Holder, 783 F.3d 30, 36 n.7 (1st Cir. 2015).  A "material error of law automatically constitutes an abuse of discretion."  Aponte v. Holder, 610 F.3d 1, 4 (1st Cir. 2010).  And within the abuse-of-discretion framework, we review de novo whether the BIA committed an error of law.  Id.  So to determine whether the BIA abused its discretion in denying Adeyanju's motion to reconsider on the alleged de novo factfinding ground, we ultimately review de novo whether the BIA properly applied the clear-error standard of review below.  See Rotinsulu, 515 F.3d at 72.

---

[12] The government also appears to argue that we lack jurisdiction because, even if the petitions present questions of law, the claims are not "colorable."  See Mehilli v. Gonzales, 433 F.3d 86, 93 (1st Cir. 2005).  But, as we've said before, this meshes with the merits, see Perez-Trujillo, 3 F.4th at 22 n.5, so if we do find the claims colorable, then we would have jurisdiction.

- 21 -

## A. The existence and nature of the equities

Kicking it off, Adeyanju takes issue with the BIA's reliance on one of its precedents, Matter of H-L-H- & Z-Y-Z-, 25 I. & N. Dec. 209 (BIA 2010), when it denied his reconsideration motion. In that case, the BIA said that "[i]n order to determine, under de novo review, whether specific facts are sufficient to meet a legal standard . . . the Board has authority to give different weight to the evidence from that given by the Immigration Judge." Id. at 212. The BIA cited H-L-H- & Z-Y-Z- for the proposition that it could "weigh evidence differently than an Immigration Judge" in finding certain evidence to be a negative factor.

We understand Adeyanju to offer four reasons why we should abrogate H-L-H- & Z-Y-Z-'s conclusion that the BIA may "give different weight to the evidence from that given by the Immigration Judge":

- It is inconsistent with the BIA's regulations.

- It is inconsistent with BIA precedent.

- It is inconsistent with circuit court precedent.

- It relies on inapposite caselaw for the conclusion it reaches.

We take each in turn, rejecting each.

First, Adeyanju says that H-L-H- & Z-Y-Z-'s reweighing conclusion is inconsistent with the regulations forbidding the BIA

- 22 -

from reviewing de novo the IJ's findings of fact. See 8 C.F.R. § 1003.1(d)(3)(i) (2020). According to Adeyanju, the BIA lacks the authority to reweigh the evidence and find new negative (or positive) equities on appeal when the IJ did not find those same equities. He says the BIA is bound, absent a finding of clear error, by the IJ's finding of the existence and nature of the equities relative to the exercise of discretion. If the BIA sees another equity in the record, his argument goes, the BIA must state why it was clearly erroneous for the IJ to not have considered that fact as a negative or positive equity before including it in its own discretionary calculus.

For this proposition, Adeyanju cites to Vasquez Chavez v. Barr, 804 F. App'x 633 (9th Cir. 2020), an unpublished disposition from the Ninth Circuit. There, the court addressed a petition for review of a BIA decision reversing an IJ's grant of adjustment-of-status relief. In setting forth its understanding of how clear-error review applied to the IJ's listed equities, the court stated that "in reviewing the IJ's grant of adjustment of status, the BIA was bound (absent clear error) by the IJ's factual findings about the existence and nature of equities weighing for and against granting the application." Id. at 635. We, of course, are not bound by Vasquez Chavez, see Caldero-Guzman v. Holder, 577 F.3d 345, 349 (1st Cir. 2009) (noting we are not bound by Ninth Circuit cases) -- nor is the Ninth Circuit, see Corbin v. Time

- 23 -

Warner Ent.-Advance/Newhouse P'ship, 821 F.3d 1069, 1076 n.5 (9th Cir. 2016) (noting the court isn't bound by prior unpublished decisions).[13]

The government, for its part, draws a line between the factual finding that an event occurred, and the discretionary judgment as to whether the event should bear negative or positive weight in the discretionary calculus, reasoning by analogy to other BIA precedent. See Matter of A-S-B-, 24 I. & N. Dec. 493, 497 (BIA 2008) (noting that "[a]fter the Board has determined that the Immigration Judge's findings regarding the facts underlying the hardship claim are not clearly erroneous, it may review de novo whether the facts support a conclusion that the hardship rises to the required level," and that "[i]n determining whether established facts are sufficient to meet a legal standard . . . the Board is entitled to weigh the evidence in a manner different from that accorded by the Immigration Judge"), overruled in part on other grounds by In re Z-Z-O-, 26 I. & N. Dec. 586, 589-91 (BIA 2015). For example, the government says, whether Adeyanju had a child out of wedlock is a factual conclusion. But whether that is evidence of immoral character to support a negative equity is a discretionary conclusion the BIA is free to reach under its de novo review.

---

[13] We also note that no court, including the Ninth Circuit, has cited Vasquez Chavez.

- 24 -

To the extent Adeyanju suggests we should apply a <u>Vasquez Chavez</u>-like rule in our circuit, we do not find <u>Vasquez Chavez</u> persuasive.[14]  As we've explained, the clear-error standard "was not intended to restrict the BIA's powers of review, including its power to weigh and evaluate <u>evidence introduced before the IJ</u>." <u>Rotinsulu</u>, 515 F.3d at 73 (emphasis added).  The clear-error standard does not restrict the BIA's authority to "analyze[] the evidence that had been presented in the immigration court," but rather constrains it from "supplement[ing] the record by considering new evidence."  <u>Id.</u>[15]

_____

[14] We note, however, that we do not decide (as the government pressed at oral argument) that the BIA's judgment that a fact is a negative equity is always immune from judicial review.  We need not decide here whether the BIA might commit legal error in its decision that a particular fact supports the finding of a negative equity.  Adeyanju doesn't argue that any of the facts the BIA relied on could not, as a matter of law, support a finding of a negative equity.  He argues only that the BIA cannot find a positive or negative equity that the IJ had not previously found.

[15] Another reason we don't find <u>Vasquez Chavez</u> persuasive is that to support its broad proposition, <u>Vasquez Chavez</u> cites to <u>Ridore</u> v. <u>Holder</u>, 696 F.3d 907, 921-22 (9th Cir. 2012), presumably for the language in <u>Ridore</u> that "the BIA's list of equities differed from those set forth by the IJ, and the BIA therefore 'overturn[ed] the IJ's findings and enter[ed] its own findings of fact.'"  <u>Id.</u> at 921 (alteration in original).  Yet that quotation comes not from a legal conclusion made by the court, but a party's argument.  Sure, one could read <u>Ridore</u> to imply that it thought the BIA ought to "properly defer[] to the IJ's factual findings with respect to the equities" and then weigh them as a matter of discretion.  <u>Id.</u>  Yet <u>Ridore</u> didn't cite any legal authority for the proposition that the characterization of a fact as a positive or negative equity is itself a factual finding.  Neither <u>Vasquez Chavez</u> nor <u>Ridore</u> persuades us to adopt such a rule in our circuit.

We are not the only circuit to conclude that the BIA does not violate clear-error review when, in explaining its legal or discretionary conclusion, it pulls from the undisputed record additional underlying facts not spotted by the IJ. See, e.g., Padmore v. Holder, 609 F.3d 62, 68 (2d Cir. 2010) (finding impermissible factfinding where the BIA relied on "disputed material facts with respect to which the IJ reached no resolution" (emphasis added)); James v. Barr, 756 F. App'x 97, 98 (2d Cir. 2019) (concluding the BIA didn't engage in de novo factfinding by identifying an additional conviction not found by the IJ but supported by the respondent's own testimony); Andrickson v. Att'y Gen. of the U.S., 433 F. App'x 124, 126 (3d Cir. 2011) (concluding no impermissible factfinding when the BIA "mentioned the pre-sentence report, which the IJ did not reference in its decision"); Nathanial v. Holder, 433 F. App'x 22, 24 (2d Cir. 2011) ("Accordingly, because the BIA did not make new factual determinations of disputed factual questions or rely on facts outside of the record, the BIA did not engage in factfinding . . . ."); Efimova v. Mukasey, 292 F. App'x 118, 120 (2d Cir. 2008) (finding no impermissible factfinding with the BIA's "decision to quote portions of the record that were not emphasized by the IJ").

Adeyanju's three remaining criticisms of H-L-H- & Z-Y-Z- don't convince us that we should abrogate it, at least under the circumstances of this case. Adeyanju says that other BIA

precedents make clear that the BIA lacks the authority to reverse a factual conclusion under clear-error review merely because the BIA would have weighed the evidence differently than the IJ. But H-L-H- & Z-Y-Z-'s conclusion that the BIA may "give different weight to the evidence" in "determin[ing], under de novo review, whether specific facts are sufficient to meet a legal standard," 25 I. & N. Dec. at 212, is not, as we see it, an erroneous view of the law, as our case law holds, cf. DeCarvalho v. Garland, 18 F.4th 66, 73 (1st Cir. 2021) (clarifying that BIA review of facts is for clear error, but review of "how the law applies to those facts" is de novo). And Adeyanju's cherry-picked quotations from BIA decisions shed no light on whether the IJ's conclusion that a fact justifies considering the equity to be negative or positive is, itself, a finding of fact. See, e.g., Matter of Casanova, 26 I. & N. Dec. 494, 498, 500, 505-09 (BIA 2015) (stating, as Adeyanju notes, that "[i]nferences from direct and circumstantial evidence are also reviewed for clear error," but in a case concerning reliability of testimony, the immigrant's role in and knowledge of acts of torture, and witness credibility); Matter of Y-L-, 24 I. & N. Dec. 151, 159 (BIA 2007) (stating the uncontroversial proposition that questions of intent are factual ones reviewed for clear error); Matter of R-S-H-, 23 I. & N. Dec. 629, 637, 641 (BIA 2003) (stating broadly in line with Adeyanju's quotations that the BIA cannot overturn a "factfinding" merely "because the Board would

- 27 -

have weighed the evidence differently," but doing so in a case involving issues of an adverse credibility determination and whether the immigrant had links to terrorism).

Nor does the litany of these out-of-circuit cases on which Adeyanju relies to press that the BIA cannot "evaluate[] and reweigh[] the facts anew" clarify whether the characterization of a fact as a positive or negative equity is itself a factual finding. Although some of the cases Adeyanju cites recognize the general proposition that the BIA cannot reweigh the facts afresh, they also recognize the distinction between fact findings and how those underlying facts fit into a legal or discretionary conclusion. See, e.g., Zhou Hua Zhu, 703 F.3d at 1314 (noting the distinction between "fact-finding about the likelihood of a future event" and the legal question of "whether that future event would constitute persecution or . . . warrant a well-founded fear"); Waldron v. Holder, 688 F.3d 354, 361 (8th Cir. 2012) (noting that "there is a difference between weighing the factual findings of the IJ and reweighing the underlying evidence and testimony behind those factual findings to reach new factual conclusions," but also that "the BIA has the discretion to weigh the IJ's factual findings differently than the IJ when making the ultimate determination of whether an applicant demonstrated 'exceptional or extremely unusual hardship'"). Others involve cases addressing issues that fall clearly within the scope of a factual finding. See, e.g.,

Alimbaev, 872 F.3d at 197-200 (considering whether the BIA violated clear-error review in reversing determination of testimony's credibility); Estrada-Martinez v. Lynch, 809 F.3d 886, 896 (7th Cir. 2015) (considering whether the BIA overstepped clear-error review as to the IJ's finding of likelihood of torture).

Finally, Adeyanju contends that H-L-H- & Z-Y-Z- is legally flawed because it relied on inapposite caselaw for the proposition that the BIA has the authority to "give different weight to the evidence from that given by the Immigration Judge." 25 I. & N. Dec. at 212. Specifically, he says that Rotinsulu -- a case from our court cited by the BIA -- does not lend any support for that proposition. Though he recognizes that we said in Rotinsulu that the clear-error standard "was not intended to restrict the BIA's powers of review, including its power to weigh and evaluate evidence introduced before the IJ," 515 F.3d at 73, Adeyanju contends that case is distinguishable because the BIA there relied on other evidence to affirm, rather than reverse, the IJ's determination. Adeyanju does not explain why that procedural posture matters here, and we think that is -- at least in the context of this case -- a distinction without a difference. The fact that Rotinsulu involved a case in which the BIA "did not in any way impeach, impugn, or denigrate the IJ's factual findings," id., does not answer the ultimate question here: Whether the BIA "denigrate[s] the IJ's factual findings" when reweighing the

- 29 -

record evidence to determine the existence and nature of the equities relevant to the adjustment-of-status application.[16]

Thus, we conclude as a matter of first impression that, under the regulation establishing the BIA's standards of review, 8 C.F.R. § 1003.1(d)(3) (2020), as well as BIA and circuit court precedent, the BIA had the de novo legal authority to assign various weights -- positive or negative, heavy or little -- to those undisputed underlying facts in its discretionary calculus.[17]

In doing so, we also join a chorus of our sister circuits that have concluded that the BIA does not violate the clear-error regulation when it identifies other undisputed facts in the record, not cited by the IJ, and applies different discretionary weight to those facts. Accord, e.g., Guevara v. Gonzales, 472 F.3d 972, 975 (7th Cir. 2007) (holding the BIA's determination that a factor was neutral rather than positive was not "factfinding"); Wallace, 463 F.3d at 141 ("Although any reversal by the BIA of an IJ's discretionary determination must involve consideration of the

_____

[16] Moreover, setting aside any slight differences in procedural posture, Rotinsulu nonetheless still helps clarify our understanding of how the clear-error-review regulation operates. Rotinsulu offered our reasoned interpretation of the regulation and concluded that the regulation does not restrict the BIA's authority to review the evidence submitted before the IJ. 515 F.3d at 73.

[17] Again, we do not decide here whether there may lie some claim of legal error in the BIA's decision to apply discretionary weight to particular facts. See supra at 25 n.14.

underlying facts, a review of the factual record by the BIA does not convert its discretionary determination as to whether a petitioner warrants an adjustment of status into improper factfinding."); Delgado-Reynua v. Gonzales, 450 F.3d 596, 598, 599-600 (5th Cir. 2006) (finding no impermissible factfinding even where "the BIA noted additional, material negative factors" not relied on by the IJ).

Indeed, the rulemaking adopting the clear-error standard, too, draws the distinction we have discussed, noting that clear-error review applies "only to the factual findings by an immigration judge . . . that form the factual basis for the decision under review" and not to "determinations of matters of law, nor to the application of legal standards, in the exercise of judgment or discretion." BIA Reforms, 67 Fed. Reg. at 54890. It continues to draw that distinction in the context of forms of discretionary relief:

> What have historically been referred to as "equities" are facts that the respondent establishes in his or her case, and these factual determinations by an immigration judge may be reviewed by the Board only to determine if they are clearly erroneous. However, the "discretion," or judgment, exercised based on those findings of fact, and the weight accorded to individual factors, may be reviewed by the Board de novo.

Id.[18]

H-L-H- & Z-Y-Z-'s conclusion that the BIA may reweigh the undisputed record evidence to reach its discretionary conclusion is thus, in these circumstances, not inconsistent with the regulation.

**B. Changes to the specific equities**

Finding no infirmity in the BIA's reweighing of the undisputed record evidence to determine whether certain facts give rise to a positive or negative equity for the discretionary analysis, we turn to the BIA's application of the clear-error standard to certain factual issues relevant to the equities here. Adeyanju spies five areas in which he claims the BIA reversed "factual" findings without employing clear-error review. We take each of these grounds in turn. In doing so, we review the BIA's

---

[18] Indeed, this reasoning is picked up by another recent unpublished decision from the Ninth Circuit -- giving us another reason not to find Vasquez Chavez persuasive. See De La Luz Ramos v. Garland, 861 F. App'x 145, 147 (9th Cir. 2021). In De La Luz Ramos, the Ninth Circuit addressed an argument that the BIA engaged in improper factfinding in conducting a discretionary analysis of whether the immigrant was convicted of a particularly serious crime. Id.; see Konou v. Holder, 750 F.3d 1120, 1127 (9th Cir. 2014) (noting the Ninth Circuit considers this a discretionary decision). Specifically, the petitioner claimed that the BIA violated clear-error review in determining that his "three-year term of imprisonment is a 'significant sentence[.]'" De La Luz Ramos, 861 F. App'x at 147. Yet the Ninth Circuit said that "was not a factual finding." Id. Rather, the court said, "the BIA was assigning weight ('significant') to a fact (three-year sentence) as part of its discretionary analysis." Id. The court did not cite Vasquez Chavez.

denial of Adeyanju's motion to reconsider under the abuse-of-discretion rubric set forth previously.  See Dimova, 783 F.3d at 36 n.7.

### 1.    Escalation of the "creepy" behavior

First up, Adeyanju takes issue with the BIA's review of the one IJ factual finding the BIA directly confronted.  The IJ, recall, said that though Adeyanju had some "creepy" behavior documented in 2014 and 2015, "[t]here is insufficient evidence that any reports have been generated or any incidents have occurred from 2016 to the present day."  According to the BIA, though, the IJ "erroneously found" that Adeyanju's "creepy" behavior hadn't occurred again since 2016.  Rather, the BIA said, "the record reflects that [Adeyanju]'s behavior may have instead escalated," citing to his 2019 arrest.

Adeyanju first latches onto the BIA's "erroneously found" language to contend that it reveals the BIA's failure to apply clear-error review.  Rather than concluding the IJ clearly erred, as the standard goes, the BIA instead called the IJ's finding simply "erroneous[]."  Continuing, he says the BIA's statement that Adeyanju's behavior "may have escalated" also reflects that the BIA did not have a firm conviction (harkening back to the clear-error standard) that the IJ reached an incorrect conclusion about Adeyanju's post-2016 conduct.  See BIA Reforms, 67 Fed. Reg. at 54889 (to find clear error, the BIA must be "left

- 33 -

with the definite and firm conviction that a mistake has been committed").  The government counters by pointing to the BIA's ruling on the motion to reconsider, wherein the BIA underscores that it intended this to be a clearly erroneous determination. According to the government, whether the IJ believed Adeyanju's side of the allegations surrounding his 2019 arrest is "immaterial" -- all that matters is that there was record evidence showing that charges were filed.

While we are not persuaded by Adeyanju's semantical hair-splitting, we do agree that the BIA failed to adequately employ clear-error review and thus committed legal error when it concluded that Adeyanju's "creepy" behavior may have escalated. As the government now appears to concede in its second round of briefing to us, this is not a case where the BIA was merely applying different discretionary weight to the IJ's findings of fact and record evidence.[19]  Nor is this a case where the IJ stayed silent on the issue and the BIA filled in the gap by citing to undisputed

---

[19] Initially, in the briefing on the first petition for review, the government said that the BIA was merely applying different discretionary weight to the allegations of sexual assault. However, in the briefing on the second petition for review, the government no longer advances this argument.  Instead, the government acknowledges that the BIA did, in fact, reverse the IJ's factual finding here, contending that the BIA "did not abuse its discretion when it found no grounds to reconsider its reversal of the immigration judge's clearly erroneous factual finding," that it "reversed the immigration judge's factual finding," and that the BIA noted certain facts "[i]n explanation for its reversal of this factual finding."

record facts. Rather, the IJ explicitly found that the "creepy" behavior was confined to 2014-2015, and the BIA explained in denying Adeyanju's motion to reconsider that it was reversing the IJ's factual finding on this point and explaining its "firm conviction that the Immigration Judge's finding of fact in this regard was erroneous." The question here is thus whether the BIA adequately applied that clear-error standard.

At first blush, the government's contention that the BIA merely looked to the record evidence that contradicted the IJ's conclusion seems plausible given the uncontroverted fact that Adeyanju was arrested for sexual assault. But the line between factfinding and the BIA's application of discretionary weight to undisputed record facts is fine, and the problem here is that the IJ specifically found, as a factual matter, that Adeyanju had not engaged in any creepy behavior since 2016 notwithstanding his acknowledgment of the 2019 arrest. In other words, the IJ made a factual determination about the nature and circumstances of Adeyanju's 2019 behavior. And implicit in that finding is a credibility determination by the IJ as to what kind of conduct Adeyanju engaged in after 2016. While the IJ did not make explicit his reasoning for his finding, the record suggests the IJ, in minimizing the significance of the 2019 conduct, was influenced by Adeyanju being "candid about his criminal record" and "actually admitt[ing to] having sex with the victim," but asserting the sex

- 35 -

was consensual.  Then from that credibility determination, the IJ, by his lights, plausibly read the evidence as demonstrating that Adeyanju's conduct in the pending criminal case was quite different from the earlier behavior.

On the other hand, in its review of the record, the BIA saw things quite differently.  It viewed Adeyanju's "creepy" conduct as escalating with his 2019 arrest rather than it being a horse of a different color.  Problem is, although the BIA's interpretation of how the 2019 arrest related to the "creepy" conduct was, undoubtedly, also supported by the record and was another permissible view of the evidence, choosing another plausible interpretation of the evidence is factfinding and does not meet the BIA's obligation to utilize clear-error review.  See Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 312 (1st Cir. 2019).  The BIA's job, if it questioned the IJ's determination that Adeyanju's 2019 behavior was not of the same ilk as that in 2014-2015, was to explicate why the finding was "illogical or implausible," not substitute its own factual judgments.  Anderson v. Bessemer City, 470 U.S. 564, 577 (1985); see also BIA Reforms, 67 Fed. Reg. at 54889 (citing Anderson, 470 U.S. at 574).  Further, if the BIA thought the IJ needed to take a second look at the criminal allegations, it could have remanded.  8 C.F.R. § 1003.1(d)(3)(iv) (2020) ("If further factfinding is needed in a particular case, the Board may remand the proceeding to the

immigration judge . . . ."). The BIA does not meet the clear-error standard by simply pointing to potentially contradictory evidence in the form of the allegations in the police report (which the IJ acknowledged but discounted given Adeyanju's consent defense) and Adeyanju's initial response to police questioning. On this point, the BIA committed legal error.[20]

### 2. **Purported dishonesty**

Next, the BIA placed negative weight on the fact that Adeyanju had "lied to the police to avoid responsibility" in the pending criminal case for kidnapping and sexual assault.[21] According to Adeyanju, the BIA reached this conclusion "independently" and without applying the clear-error standard. In fact, Adeyanju contends, the IJ found him to be "credible."

Adeyanju misconstrues the record. Yes, the IJ did find Adeyanju to be a credible witness. But that finding related to

---

[20] We need not opine on whether the BIA could ultimately conclude the IJ's factual determinations on the veracity of the pending criminal charges are clearly erroneous. We decide only that, if the BIA thinks that is so, it must surmount the high bar of clear-error review and thoroughly explain why it was "illogical or implausible" for the IJ to conclude that Adeyanju's 2019 arrest does not reflect that Adeyanju's "creepy" behavior from 2015 and 2016 may have escalated.

[21] And as we noted earlier, those police reports indicate that, when first approached by police, Adeyanju repeatedly denied having sexual intercourse with the victim and lied about his medical ability to do so. Then, before the IJ (and after the results of the DNA-comparison test were back), Adeyanju admitted that he did.

Adeyanju's testimony before the IJ, not to the answers he gave to the Maine police investigating the sexual-assault allegations. Thus, the BIA did not violate the clear-error standard of review here by engaging in de novo factfinding because, contrary to Adeyanju's suggestion, the IJ did not find that Adeyanju had been honest with the police. In fact, Adeyanju never argued -- and does not argue now -- that the police report describing his statement to the police is inaccurate. As such, Adeyanju gives us no viable reason why it was improper for the BIA to consider this evidence when conducting its discretionary assessment. See Arias-Minaya v. Holder, 779 F.3d 49, 54 (1st Cir. 2015) (noting that, as a general matter, "immigration courts may consider police reports even when they rest largely on hearsay").[22]

To be clear, the BIA does not engage in impermissible factfinding where it "d[oes] not supplement the record by considering new evidence but, rather, merely analyze[s] the evidence that had been presented in the immigration court." Rotinsulu, 515 F.3d at 73. The clear-error standard of review

_____

[22] In Arias-Minaya, we did note that there are limits to that general rule. See 779 F.3d at 54. "[T]hose limits are generally satisfied as long as the trier first determines that the report is reliable and that its use would not be fundamentally unfair." Id. Here, unlike in Arias-Minaya, there is no record evidence suggesting that the IJ determined that the police reports were reliable. Yet Adeyanju does not argue on appeal that the BIA or IJ erred on this ground. We thus deem waived any potential argument that the police reports should not have been relied on. See, e.g., Dimova, 783 F.3d at 38.

- 38 -

"was not intended to restrict the BIA's powers of review, including its power to weigh and evaluate evidence introduced before the IJ." Id. (emphasis added); see Matter of A-S-B-, 24 I. & N. Dec. at 498 ("Were we to treat the matter otherwise, we would be precluded from considering the total content of any documentary evidence submitted before the Immigration Judge unless the entire document was read into the Immigration Judge's decision."). The regulation does not restrict the BIA's authority to "analyze[] the evidence that [was] presented in the immigration court," but rather constrains it from "supplement[ing] the record by considering new evidence." Rotinsulu, 515 F.3d at 73; see BIA Reforms, 67 Fed. Reg. at 54891-92 (noting the regulation "generally prohibits the introduction and consideration of new evidence in proceedings before the Board" but also that "[t]he Board reviews the record of proceedings made before the immigration judge"). And the BIA "has the prerogative -- indeed, the duty -- of examining the basis for, and then synthesizing and analyzing, the IJ's findings." Chen, 703 F.3d at 23.

The undisputed record facts here amply support the BIA's conclusion that Adeyanju lied to the police. See Rotinsulu, 515 F.3d at 73; Padmore, 609 F.3d at 68 (finding impermissible factfinding where the BIA relied on "disputed material facts with respect to which the IJ reached no resolution" (emphasis added)); see also, e.g., James, 756 F. App'x at 98 (concluding the BIA

didn't engage in de novo factfinding by identifying an additional conviction not found by the IJ but supported by the respondent's own testimony).  We see no error.

### 3.  Indicia of past marriage fraud

Third, Adeyanju claims the BIA contradicted the IJ's findings when it "changed the nature of the evidence of purported past immigration fraud."  According to Adeyanju, the IJ didn't view the indicia of marriage fraud as a negative equity.  Yet, the BIA clearly did when it concluded the "indicia of past immigration fraud" was a negative factor.

Adeyanju's argument is a non-starter because the IJ did view the evidence of marriage fraud as a negative equity.  To be sure, the IJ found the evidence to be "inconclusive."  At the same time, though, the IJ admitted that "there is some evidence of fraud in the previous marriage in the notice of intent."  The IJ then "place[d] some weight on the notice of intent."  And the BIA, following the IJ's lead, did not make any finding as to whether the marriage was in fact fraudulent.  Adeyanju may opine that the BIA, unlike the IJ, didn't place enough discretionary weight on the other evidence that the IJ thought tended to rebut the allegations of marriage fraud.  But weight determination is not a claim of legal error over which we have jurisdiction.  Urizar-Carrascoza v. Holder, 727 F.3d 27, 32-33 (1st Cir. 2013) (noting

we lack jurisdiction to review the BIA's discretionary determination); see 8 U.S.C. § 1252(a)(2)(B).

Undeterred, Adeyanju stresses that the BIA's view of the facts on marriage fraud was "expressly contrary to the IJ's interpretation." He highlights the fact that the BIA looked to underlying evidence in the record suggesting marriage fraud that the IJ did not highlight. According to Adeyanju, then, the BIA's review of these facts was "tantamount to a de novo" factual review.

We disagree. "[A] review of the factual record by the BIA does not convert its discretionary determination as to whether a petitioner warrants an adjustment of status into improper factfinding." Wallace, 463 F.3d at 141. The BIA "has the prerogative -- indeed, the duty -- of examining the basis for, and then synthesizing and analyzing, the IJ's findings." See Chen, 703 F.3d at 23. Here, the BIA reviewed the undisputed record evidence, relied on by USCIS in the notice of intent, to determine that the "indicia of past immigration fraud" was a negative factor. The IJ, too, placed negative weight on the notice of intent even though he found the evidence of marriage fraud, on the whole, inconclusive. We see no violation of clear-error review here.

### 4. Indicia of visa-application fraud

Moving on, Adeyanju claims the BIA violated clear-error review when it looked to Adeyanju's alleged "inaccurate[]" claim on his visa application that he was engaged in Nigeria. We agree.

The IJ specifically found that Adeyanju did not intend to commit fraud or give an inaccurate answer on the application. Rather, the IJ found that Adeyanju's explanation of why he stated he was engaged to be "reasonable." The IJ even went so far as to say: "To the extent the Department is asserting that he committed fraud on the non-immigrant visa application process, the Court does not find that. And indeed, finds his explanation based on his relationship with his girlfriend and their intentions was reasonable." The BIA, though, said that Adeyanju "inaccurately claimed that he was engaged to a woman in Nigeria," and placed negative weight on this factoid. This conclusion contradicts the IJ's clear finding that Adeyanju's claims of being engaged were "reasonable."

The government chimes in that the BIA may rely on evidence in the record indicating there may have been fraud to justify a negative factor.[23] And, it says as it has argued throughout, Adeyanju merely asks us to reweigh the evidence in his favor. But we do not see this as a mere discretionary weighing of

---

[23] The government isn't clear on whether this argument applies only regarding the evidence of marriage fraud. Indeed, the government doesn't specifically explain why the BIA's reliance on Adeyanju's "inaccurate[]" claim on his visa application didn't violate the clear-error standard. And at oral argument, the government stated that the BIA made no mention of fraud on the visa application. But that's belied by the BIA's clear statement that it was considering his "inaccurate[]" claims on his "non-immigrant visa application."

- 42 -

the undisputed record evidence or the factual findings by the IJ. Adeyanju clearly disputed that he made inaccurate claims on his visa application, and the IJ agreed, finding his explanation reasonable. Yet the BIA's conclusion directly conflicts with the IJ's finding. The BIA therefore erred when it failed to apply the clear-error standard to explain why it was left with the clear conviction that the IJ mistakenly concluded the claims were reasonable.

### 5.    **Predatory and criminal behavior**

Finally, Adeyanju complains about the BIA's characterization of his past encounters with women. The BIA described Adeyanju's encounters with law enforcement concerning these incidents as "a documented history of predatory and criminal behavior towards women and adolescent girls." But, Adeyanju points out, the IJ explicitly found that Adeyanju's actions "did not rise to the level of criminal behavior," instead calling the behavior "creepy." Adeyanju contends the BIA could not deem his behavior "predatory and criminal" absent a finding of clear error by the IJ.

Looking to his papers below, we don't think Adeyanju specifically raised this particular ground of impermissible factfinding to the BIA in his motions to reconsider and reopen. However, since we will remand this case for the BIA to reconsider the two clear-error violations we've already identified, we need

not cross the bridge of whether that failure creates an exhaustion issue here. We thus do not decide whether this particular ground of error is exhausted notwithstanding that it was not included in Adeyanju's motions below. Nor do we pass on the underlying merits of Adeyanju's clear-error contention. Instead, we allow the parties to sort this piece out on remand.

*　　*　　*

To review, we've spotted two legal errors: (1) the BIA violated the clear-error standard in concluding that Adeyanju's "creepy" behavior may have escalated with his most recent arrest; and (2) the BIA violated the clear-error standard in finding Adeyanju's visa-application answers were inaccurate. The BIA therefore abused its discretion in denying Adeyanju's motion to reconsider on these grounds. The rest of the arguments, though, fall flat. The BIA did not commit legal error in placing more negative weight (or less positive weight) on facts that either the IJ relied on or lied undisputed in the record. The BIA was free, under its de novo authority, to survey the record for undisputed facts and, in combination with the IJ's factual determinations, identify additional positive or negative equities, and balance those equities anew. We will, however, grant in part the petition in 21-1616 and remand to the BIA for reconsideration of the two clear-error-standard violations we've identified. That being said, we proceed now to review Adeyanju's contention that our

remand to the BIA necessarily requires it to further remand to the IJ.  We reject this argument and explain why.

## II.  Whether the BIA Erred by Issuing a Final Order of Removal

In addition to his clear-error-standard arguments, Adeyanju makes a three-pronged attack to the BIA's decision to issue a final order of removal, which he says flouts the BIA's regulations and precedents.

### A.  Failure to remand after finding clear error

Adeyanju appears to contend that, if the BIA found clear error in the IJ's factual conclusions on appeal, then it was required to reverse the conclusions and then remand to the IJ for further consideration before issuing a final order of removal.  He says the BIA could not reverse the factual conclusions, substitute the new factual conclusions, survey the factual record itself to fill in gaps, and then conduct its de novo discretionary analysis, resulting in a final order of removal, without first letting the IJ take a pass at a discretionary calculus that accounted for the BIA's clear-error holding.

In support of his contention, Adeyanju points to case law and regulations stating that the BIA is prohibited from engaging in factfinding in the course of deciding appeals.  But we do not think the regulation requires the BIA to remand to the IJ for a new discretionary analysis whenever it makes a clear-error

determination.[24] Although it is true that the BIA must remand in those instances where further factfinding on an issue may be required to reach a resolution of the merits, see 8 C.F.R. § 1003.1(d)(3)(iv) (2020), the BIA has the authority to review the undisputed facts in the entire record and, if it finds those facts sufficient to adjudicate the appeal, it may give discretionary weight to those facts and resolve the case, see Rotinsulu, 515 F.3d at 73 (noting that the BIA may "analyze[] the evidence that had been presented in the immigration court" but cannot "supplement the record by considering new evidence"); BIA Reforms, 67 Fed. Reg. at 54890 ("[T]he 'discretion,' or judgment, exercised based on those findings of fact, and the weight accorded to individual factors, may be reviewed by the Board de novo.").[25]

---

[24] For that reason, Adeyanju's citation to rulemaking stating that the BIA "has authority to reverse erroneous fact findings and no authority to correct them" does not move the needle. BIA Reforms, 67 Fed. Reg. at 54890. The rulemaking merely clarifies that the BIA cannot "engage in de novo factfinding to 'correct' clearly erroneous facts," and aligns the procedure with that followed in the federal courts. Id. (emphasis added).

[25] Nor has Adeyanju identified any precedential BIA opinion establishing a "settled course of adjudication" at the BIA (which, recall, the BIA's variation from that "settled course" can be a ground of legal error, see Perez-Trujillo, 3 F.4th at 22) in which it will remand for a new discretionary reweighing by the IJ after a BIA finding of clear error on a finding of fact. In fact, the unpublished, non-precedential BIA opinions go both ways on this issue, meaning there was no settled course at the BIA from which to diverge, and thus no successful claim of legal error on this basis here. See Sang Goo Park v. Att'y Gen. of the U.S., 846 F.3d 645, 654 (3d Cir. 2017) (finding no settled course where there is no "obvious consistency by the BIA"); compare In re: Hong, 2008 Immig. Rptr. LEXIS 5225, at *6 (BIA Sept. 25, 2008) ("Because we

The cases Adeyanju cites actually serve to clarify this point. See Lopez-Rodriguez v. Holder, 683 F.3d 1164, 1170 (9th Cir. 2012) (remand is required for further factfinding "[w]here the IJ has not made a finding of fact on a disputed matter, and such a finding is necessary to resolution of the case" (emphasis added)); Padmore, 609 F.3d at 68 (concluding remand to the IJ for factfinding may be required where the BIA relied on "disputed material facts with respect to which the IJ reached no resolution" (emphasis added)).[26] Indeed, Padmore clarified that the need for remand to the IJ would be "to develop the factual record further" on those disputed material facts. 609 F.3d at 70. As we've noted, Adeyanju didn't dispute the fallacious statements he made to the Maine police conducting the sexual-assault investigation. Nor did

_____

have limited fact-finding authority on appeal and because some of the above-mentioned errors by the Immigration Judge involve clearly erroneous factual findings that need to be amended, we find that a remand is necessary in this case to allow the Immigration Judge to reassess the facts and to again weigh the positive and negative equities to determine whether the respondent is entitled to relief in the exercise of discretion."), with, In re: Lat, 2007 Immig. Rptr. LEXIS 3038, at *5-7 (BIA Aug. 3, 2007) (finding an instance of clearly erroneous factfinding, applying de novo review to discretionary weighing of cancellation-of-removal factors, reversing IJ's grant of relief, and ordering removal).

[26] Adeyanju also cites Ramirez-Peyro v. Gonzales, 477 F.3d 637, 641 (8th Cir. 2007), where the Eight Circuit concluded that if the BIA thought it needed a fact specifically addressed, it should have remanded to the IJ. But the court does not mention whether there was record support for the BIA's factual conclusion. And the government in Ramirez-Peyro conceded that the BIA violated clear-error review.

- 47 -

he dispute that USCIS found some indicia of marriage fraud in his marriage to Raymond.[27] So those facts did not require a remand to the IJ. Again, when this application lands before the BIA anew, it will be up to the BIA to determine whether, sans the inclusion of the two facts found in violation of clear-error review, it will need a more factually developed record before it can decide Adeyanju's appeal.

## B. Failure to explain its reasoning

Moving on to the I-751 claims in his original petition for review, Adeyanju took issue with the BIA's failure to explain why it issued a final order of removal notwithstanding the pendency of the I-751 waiver he filed with Rebecca. Nevertheless, in the BIA's subsequent decision denying his motions to reconsider and reopen, the BIA did explain its reasoning. It did not remand to the IJ to consider the I-751 waiver because the IJ lacked jurisdiction over the petition: It was still pending with USCIS. In his second petition before us, Adeyanju does not press the BIA's failure to explain its initial decision as an error. So, with a

---

[27] Adeyanju also argues that, even if the BIA properly applied the clear-error standard, further factfinding was necessary as to whether his past dishonesty and immigration fraud were negative equities. But, as we explained, the nature of the equities is not a question of fact for which remand would be necessary. And as to whether further factfinding was necessary on the disputed issues of his answers on the visa application and the escalation of his "creepy" behavior, we need not decide here whether remand was necessary for further factfinding because we conclude the BIA failed to apply the clear-error standard to those factual findings.

clarifying explanation from the BIA now on the record, we consider this claim of error moot.

### C.    Remand for consideration of the I-751 waiver

Adeyanju also contends that the BIA committed legal error when it ordered him removed even though his I-751 waiver petition -- which he filed with his second wife, Rebecca -- was still pending.[28]  The BIA's original decision was mostly silent on the I-751 waiver, aside from a footnote acknowledging that it was pending when the IJ held its hearing.  Miffed at the BIA's failure to allow him a shot at having the IJ review a potential I-751 waiver denial, see 8 C.F.R. § 216.5(f), Adeyanju included this alleged error in his motions to reconsider and reopen with the BIA.  In his motion to reconsider, he contended that the BIA committed legal error when it did not remand to the IJ (the person charged with initial appellate review authority) to determine whether he was eligible for the I-751 waiver, did not explain its reasons, and violated his due-process rights by failing to give him an opportunity to have his I-751 waiver denial heard before an IJ.  As to reopening, Adeyanju told the BIA that, since the initial decision, USCIS had denied his I-751 waiver, so the IJ now had

---

[28] Recall that the I-751 petition, filed with Raymond, was denied.  It was not until after that I-751 petition was denied that Adeyanju and Rebecca filed the I-751 waiver petition, which was still pending with USCIS at the time of the hearing before the IJ and the original appeal to the BIA.

jurisdiction. After the government clarified that USCIS had not yet issued a final denial of the I-751 waiver, only a notice of intent to deny, Adeyanju later told the BIA in his reply brief that, even if the IJ did not currently have jurisdiction over the petition, the BIA should, instead of issuing a final order of removal, remand to allow the IJ to grant continuances until the I-751 waiver denial was final.

The BIA denied both the motion to reconsider and the motion to reopen. As to the motion to reconsider, the BIA concluded that there was no error in its conclusion that the IJ lacked jurisdiction over the I-751 waiver. As to reopening, the BIA gave two reasons for its denial: (1) Adeyanju (to repeat) did not show that the IJ would then have jurisdiction to review his I-751 waiver; and (2) Adeyanju didn't show prima facie eligibility for relief under the I-751 waiver.

On appeal, Adeyanju takes on the denial of both the motion to reconsider and the motion to reopen. We begin with reopening.

"To prevail on a motion to reopen before the BIA, the movant must show 'new, material evidence that was not available or discoverable at the prior hearing and must also present a prima facie case of eligibility for the relief sought.'" Benitez v. Wilkinson, 987 F.3d 46, 52 (1st Cir. 2021) (quoting Jutus v. Holder, 723 F.3d 105, 110 (1st Cir. 2013)); see 8 C.F.R.

- 50 -

§ 1003.2(c)(1) (2020). We review the BIA's denial of Adeyanju's motion to reopen "under the 'highly deferential abuse-of-discretion standard.'" Tay-Chan v. Barr, 918 F.3d 209, 212 (1st Cir. 2019) (quoting Pineda v. Whitaker, 908 F.3d 836, 840 (1st Cir. 2018)). We will find such abuse when the complaining party shows that the BIA "committed a material error of law or exercised its authority arbitrarily, capriciously, or irrationally." Id. (quoting Gyamfi v. Whitaker, 913 F.3d 168, 172 (1st Cir. 2019)); see Benitez, 987 F.3d at 52. The BIA also abuses its discretion if it "inexplicably departs from established policies," including its own precedents, "or rests its decision on an impermissible basis." Benitez, 978 F.3d at 52 (cleaned up) (quoting Leblanc v. I.N.S., 715 F.2d 685, 693 (1st Cir. 1983)). Within the abuse-of-discretion rubric, we examine the BIA's legal conclusions de novo. Id. Where the BIA's explanation is too thin to allow us to evaluate the claims of error, we may find an abuse of discretion and remand to the BIA for further explanation. See Tillery v. Lynch, 821 F.3d 182, 185-187 (1st Cir. 2016); Aponte v. Holder, 683 F.3d 6, 14-15 (1st Cir. 2012) (Aponte II).

With those principles in mind, when it comes to the BIA's conclusion that Adeyanju failed to show his prima facie case that he was eligible for relief, we cannot deduce from the BIA's terse statement whether it was legally correct. An I-751 waiver can be granted discretionarily by the Secretary of Homeland Security if

the petitioner shows, among other potential grounds not relevant here, that "the qualifying marriage" -- here, the marriage to Raymond, not Rebecca -- "was entered into in good faith by the [immigrant] spouse, but the qualifying marriage has been terminated (other than through the death of the spouse) and the [immigrant] was not at fault" in failing to file the joint petition. 8 U.S.C. § 1186a(c)(4)(B). The BIA here merely stated that Adeyanju "has not shown that he is prima facie eligible for the relief sought." That one-liner does not give us enough to analyze why Adeyanju supposedly didn't meet his prima facie burden.[29] We thus remand to the BIA, as we have done in the past,

_____

[29] We pause to note we are assuming that we might ultimately have jurisdiction to review the BIA's reasoned explanation of why no prima facie case was established (i.e., is it a potential challenge premised on a legal or constitutional error or is it something that squarely falls within the BIA's discretionary bailiwick), as we note that the Supreme Court has granted certiorari in a case in which it has been asked to decide "[w]hether 8 U.S.C. § 1252(a)(2)(B)(i) preserves the jurisdiction of federal courts to review a non-discretionary determination that a noncitizen is ineligible for certain types of discretionary relief." Brief for Petitioners at i, Patel v. Garland, 141 S. Ct. 2850 (2021) (No. 20-979); see Cho v. Gonzales, 404 F.3d 96, 99-102 (1st Cir. 2005) (concluding we have jurisdiction to review whether a petitioner has established the non-discretionary eligibility criterion that her marriage was entered into in good faith under § 1186a(c)(4)(B), but noting § 1252(a)(2)(B)(ii) "precludes court review" of petitions based on credibility determinations and the weight applied to credited evidence, both of which are vested in the agency's sole discretion under § 1186a(c)(4)); but see Twum v. Barr, 930 F.3d 10, 19 (1st Cir. 2019) (noting some tension in our case law on this point and concluding we lack jurisdiction to review a petitioner's eligibility for a different form of discretionary relief).

for further explanation. See Aponte II, 683 F.3d at 14 (taking the same route where the BIA's decision on prima facie eligibility was too "summary" to allow us to determine its basis); Larngar v. Holder, 562 F.3d 71, 79-80 (1st Cir. 2009).

Adeyanju further contends that the BIA abused its discretion in denying the motion to reopen, as well as the motion to reconsider, on the ground that he failed to demonstrate that the IJ had jurisdiction over the I-751 waiver. Though he does not appear to dispute that the IJ lacked jurisdiction over the I-751 waiver based on the record before the BIA, he flags the BIA's failure to address his alternative argument that the BIA should remand to permit the IJ to grant continuances until the I-751 waiver denial became final.[30]

After filing his motions to reconsider and reopen but before the BIA ruled on the motions, though, the I-751 waiver decision did become final, as USCIS formally denied it on July 22, 2021. Typically, we are constrained to ignore information outside the administrative record when deciding petitions for review of BIA decisions. See 8 U.S.C. § 1252(b)(4)(A). But we have also held that we may peek outside that record and take judicial notice of agency actions in immigration proceedings to resolve whether a

---

[30] We note that it is unclear to us whether the continuances argument was part of Adeyanju's motion to reopen, motion to reconsider, or both.

claim in a petition for review may have become moot.  See Manguriu

v. Lynch, 794 F.3d 119, 121 (1st Cir. 2015).

Because it is now clear that the IJ would have jurisdiction over Adeyanju's I-751 waiver appeal, see 8 C.F.R. § 216.5(f), we need not address whether the BIA erred in refusing to remand for continuances until the IJ had jurisdiction, see Qureshi v. Gonzales, 442 F.3d 985, 988 (7th Cir. 2006) (finding moot claims of error in denying continuance motion pending adjudication of I-130 petition after USCIS dismissed the petition); see also Dia v. Garland, 852 F. App'x 981, 985 (6th Cir. 2021) (same); Ismail v. Barr, 799 F. App'x 20, 23 (2d Cir. 2020) (similar).[31]  Nor need we consider the government's alternative explanations for the BIA's failure to acknowledge Adeyanju's argument.  See, e.g., Makieh v. Holder, 572 F.3d 37, 41 (1st Cir. 2009) (noting that we "judge the action of the BIA based only on reasoning provided by the agency, not on grounds

---

[31] There appears to be some support for Adeyanju's argument that the BIA should have remanded to the IJ to grant continuances. See, e.g., Matter of Stowers, 22 I. & N. Dec. 605, 613–14 (BIA 1999) ("[W]here an alien is prima facie eligible for a waiver under section 216(c)(4) of the Act and wishes to have his or her waiver application adjudicated by the Service, the proceedings should be continued in order to allow the Service to adjudicate the waiver application."); Matter of Mendes, 20 I. & N. Dec. 833, 840 (BIA 1994) (similar); see also Jackson v. Mukasey, 305 F. App'x 369, 370 (9th Cir. 2008) ("As DHS never had the opportunity to adjudicate the application, however, we agree with Jackson's contention that the BIA was required to remand her case under" Stowers.).

constructed by the reviewing court" (quoting <u>Mihaylov</u> v. <u>Ashcroft</u>, 379 F.3d 15, 21 (1st Cir. 2004))).  Instead, we instruct the BIA on remand to consider the effect, if any, of the final denial of the I-751 waiver on Adeyanju's motions, including his newly filed motion to reopen pending before the BIA.

### CONCLUSION

For reasons we just explored, we **grant in part** the petition in 21-1616 and **remand** for further proceedings consistent with this opinion.  The remainder of the petition in 21-1616 is **denied.**  As all of Adeyanju's contentions in the petition in 21-1045 are either moot or disposed of by our decision in 21-1616, the petition in 21-1045 is **dismissed** as moot.