# United States Court of Appeals
## For the First Circuit

No. 22-1215

ALFONSO ESTUARDO MENDEZ ESTEBAN,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Kayatta, Gelpí, and Montecalvo,
Circuit Judges.

Patrick T. Roath, with whom Ropes & Gray LLP, Samuel L. Brenner, Emma Coreno, and Rachel Scholz-Bright were on brief for petitioner.
John F. Stanton, Trial Attorney, Office of Immigration Litigation, with whom Brian Boynton, Principal Deputy Assistant Attorney General, Civil Division, and Jessica E. Burns, Senior Litigation Counsel, Office of Immigration Litigation, were on brief for respondent.

May 11, 2023

**MONTECALVO**, **Circuit Judge**.  Alfonso Estuardo Mendez Esteban ("Mendez") has petitioned for review of a decision from the Board of Immigration Appeals ("BIA") dismissing his appeal of an Immigration Judge's ("IJ") decision denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), and ordering his removal to Guatemala.

Fleeing death threats and physical violence at the hands of a rival political party in Guatemala, Mendez came to the United States in January 2015 seeking protection.  Soon after he arrived in the United States, the Department of Homeland Security ("DHS") initiated removal proceedings against him.  Before the IJ, Mendez applied for asylum and related humanitarian relief.  The IJ concluded that Mendez had suffered political persecution in Guatemala and was therefore presumed to have a well-founded fear of future persecution.  The IJ went on, however, to find that DHS had successfully rebutted that presumption based on a showing of changed country conditions.  The IJ therefore denied Mendez's claims for asylum and related relief because he found that Mendez had failed to establish the requisite basis for his fear.  Mendez appealed to the BIA.  The BIA affirmed the IJ's decision, and this petition followed.

For the reasons that follow, we grant the petition and vacate the decisions of the BIA and IJ as to Mendez's political

- 2 -

opinion-based asylum and withholding of removal claims, remand for further proceedings on those claims, and deny what remains of the petition.

## I.   Factual Background[1]

Mendez is a Guatemalan citizen of indigenous ancestry. In 2013, he joined Guatemala's Libertad Democrática Renovada party ("LIDER"). Mendez believed LIDER's community-centric agenda -- which advocated for greater investment in local infrastructure and municipal services -- stood in stark contrast to what he viewed as the corrupt politics of LIDER's political rival, the National Unity of Hope party ("UNE"). At the time, UNE controlled the regional government where Mendez lived, but LIDER was organizing to challenge that control in Guatemala's 2015 elections. By 2014, Mendez was directing LIDER's advertising and, in furtherance of LIDER's effort to defeat UNE in the 2015 elections, actively campaigning for LIDER throughout the region.

In November 2014, Mendez, his brother-in-law Armando, and two other LIDER members traveled to a nearby community to campaign for LIDER candidates. During this trip, six UNE members approached Mendez and his fellow LIDER members and began making death threats. The UNE members also warned against them

---

[1] We draw the relevant facts from the administrative record. See Adeyanju v. Garland, 27 F.4th 25, 31 (1st Cir. 2022). This includes Mendez's testimony before the IJ, which the IJ found to be credible. See id.

continuing to campaign for LIDER in the community.  After this confrontation, Mendez and the other LIDER members left.

The next month, Mendez and the same three LIDER members traveled again -- this time to a different community -- to campaign on behalf of LIDER.  While the LIDER members were distributing LIDER materials and meeting with potential recruits, two armed UNE members approached the group and asked what they were doing there.  When Mendez responded that he was campaigning for LIDER, one UNE member beat him.  As a result of the beating, Mendez was hospitalized for one night where he was treated with pain killers.

About one week later, on December 23, 2014, Mendez again traveled out-of-town with the same group of LIDER members.  This time, they drove to a nearby community to pick up LIDER supporters for a Christmas celebration.  At the prearranged pick-up location, UNE members were also waiting for a ride from members of their party.  Recognizing Mendez's car, the UNE members approached it and confronted Mendez.  The UNE members brandished guns, accused Mendez of targeting LIDER recruitment at UNE members, and fired warning shots into the air.  Fearing for his life, Mendez left. He never returned to that community or the other two communities where he had been targeted by members of UNE.

On December 30, 2014 -- seven days after Mendez witnessed the UNE members fire warning shots -- his brother-in-law

Armando's body was found with a fatal gunshot wound to his chest. The police were called, but Armando's death was never investigated. Mendez believes that Armando, Mendez's only family member known to publicly support LIDER, was killed by members of UNE. It was Armando's death that made Mendez "decide[] to leave the country."

Soon after, Mendez fled Guatemala for the United States. He presented himself at a U.S. port of entry on January 18, 2015, and during an inspection interview, informed an officer that he feared for his life in Guatemala. DHS detained Mendez and placed him in removal proceedings where he promptly conceded his removability. While detained, Mendez passed a credible fear interview and was released on parole to seek asylum.

## II. Procedural History

Having conceded removability, Mendez's removal proceedings centered on his eligibility for humanitarian relief. On December 11, 2015, Mendez timely applied for asylum, withholding of removal, and CAT protection. Mendez alleged that he had been persecuted in Guatemala based on two independently protected grounds -- his political opinion and his membership in the particular social group of males of indigenous ancestry who are politically active in Guatemala -- and argued that he would be harmed or killed if he were returned to Guatemala.

## A.    The IJ's Decision

At the merits hearing before the IJ, Mendez testified to the scope of his political activity in Guatemala, his work for LIDER, his encounters with members of UNE, and the circumstances surrounding Armando's death.  Finding Mendez's testimony credible, the IJ concluded that Mendez had suffered political persecution in Guatemala, giving rise to a presumption of a well-founded fear of future persecution.[2]  Relying on a 2017 State Department country conditions report and Mendez's own testimony, the IJ further found, however, that DHS had rebutted that presumption by showing fundamental changes to the conditions in Guatemala that negated the objective basis for Mendez's once well-founded fear.  The IJ therefore found Mendez ineligible for asylum and related relief because he failed to prove that his asserted fear was -- at a minimum -- well-founded.  The IJ reasoned that "because the UNE party is no longer in power, there[] [had] been a change in circumstances such that [Mendez] no longer has well-founded fear of the UNE party."

The IJ also denied Mendez's alternative basis for asylum: persecution on account of his membership in a proposed

_____

[2] The IJ concluded that, taken together, the following three incidents amounted to past persecution on account of Mendez's political opinion: (1) UNE members threatened "they would kill [Mendez]"; (2)  armed UNE members physically beat Mendez; and (3) UNE members threatened Mendez by shooting bullets into the air.

particular social group comprised of "[m]ales of indigenous ancestry who are politically active in Guatemala." The IJ found insufficient evidence of a nexus between UNE's targeting of Mendez and his indigenous ancestry to establish the past persecution or fear of future persecution required for asylum or withholding of removal. The IJ therefore concluded that Mendez could not establish eligibility for asylum or withholding of removal on account of membership in his proposed particular social group.

Without discussing the merits of his claims, the IJ also denied Mendez's political violence-based requests for withholding of removal and CAT protection. The IJ found that because Mendez failed to meet asylum's less onerous showing of a "well-founded" fear of future political persecution, he necessarily failed to make the heightened showing of likely future harm necessary for withholding of removal. The IJ further found that Mendez had not shown that it was more likely than not that he would be tortured if returned to Guatemala, as is necessary for protection under CAT. Accordingly, the IJ denied all requested relief and ordered Mendez removed to Guatemala. Mendez appealed to the BIA.

## B. The BIA's Decision

On appeal to the BIA, Mendez challenged, inter alia, the IJ's conclusion that changed country conditions in Guatemala had obviated any need for political asylum. Specifically, Mendez argued that the IJ erred in finding that DHS had satisfied its

rebuttal burden where the record lacked evidence that changes in Guatemala undermined the objective basis for Mendez's particular substantiated fear.

The BIA affirmed the IJ's conclusion that DHS had met its rebuttal burden based on four facts, drawn in part from the 2017 State Department country conditions report and in part from Mendez's own testimony: (1) that "Guatemala has had a peaceful transition of power;" (2) "that the rival political party, . . . [UNE], whom the respondent fears is no longer in power at the national level"; (3) that "the political party [Mendez] was a member of, . . . [LIDER], is no longer in existence"; and (4) that Mendez "has not been threatened since the last election and no one has contacted or threatened [Mendez's] family in Guatemala on his behalf since he fled the country in 2015." Accordingly, the BIA discerned no error, dismissed Mendez's appeal, and affirmed the IJ's decision denying all forms of requested relief. Mendez petitioned this court for review.[3]

## III. Standard of Review

We review the BIA's decision in this case as the agency's final decision and look to the IJ's decision only "to the extent that the BIA deferred to or adopted the IJ's reasoning." Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022).

---

[3] Accompanying his petition, Mendez filed an unopposed motion to stay his removal, which this court granted on April 1, 2022.

Questions of law are reviewed de novo, "subject to appropriate principles of administrative deference." Larios v. Holder, 608 F.3d 105, 107 (1st Cir. 2010). Factual findings are reviewed under the deferential substantial-evidence standard, "meaning we accept the findings 'as long as they are supported by reasonable, substantial[,] and probative evidence on the record considered as a whole.'" Aguilar-De Guillen v. Sessions, 902 F.3d 28, 32 (1st Cir. 2018) (quoting Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014)).

## IV. Discussion

### A. Asylum

To qualify for asylum, an applicant must be a "refugee," as defined by the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 1208.13(a). Under the INA, a refugee is a noncitizen who is "unable or unwilling to return to" his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Here, Mendez claimed persecution on account of two independent grounds: political opinion and membership in a particular social group.

### 1. Past Persecution - Political Opinion

When an IJ concludes that an asylum seeker experienced past persecution, that applicant is entitled to a rebuttable

- 9 -

presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). To rebut this presumption, DHS must prove, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution."[4] 8 C.F.R. § 1208.13(b)(1)(i)(A); see Palma-Mazariegos v. Gonzales, 428 F.3d 30, 34 (1st Cir. 2005).

Here, the IJ concluded that Mendez suffered past persecution in Guatemala on account of his political opinion and afforded Mendez the benefit of the presumption. DHS does not challenge that finding. However, the IJ also concluded -- and the BIA agreed -- that DHS had successfully rebutted that presumption, rendering Mendez ineligible for asylum. This required DHS to prove that the conditions in Guatemala had "changed so dramatically" since December 2014 "as to undermine the well-foundedness of [Mendez's] fear." Chreng v. Gonzales, 471 F.3d 14, 21 (1st Cir. 2006).

Because the denial of Mendez's asylum claim turned on reasoning about specific facts, we review the decision below for substantial evidence. See Moreno v. Holder, 749 F.3d 40, 43 (1st

_____

[4] DHS can also rebut the presumption of well-founded fear by showing that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country . . . [and] it would be reasonable to expect the applicant to do so." 8 C.F.R § 1208.13(b)(1)(i)(B). Because this avenue is not pursued here, we need not address it.

- 10 -

Cir. 2014). On the record before us, we conclude that, even under the deferential substantial evidence standard, the record fails to establish changed conditions in Guatemala that have negated Mendez's already substantiated fear.

### i. Country Conditions Report

In affirming the IJ's conclusion that changed conditions in Guatemala eliminated Mendez's need for political asylum, the BIA relied primarily on information in the United States Department of State's 2017 country conditions report on Guatemala (the "2017 report"). But state department reports, even where "probative of country conditions," Palma-Mazariegos, 428 F.3d at 36, seldom can carry DHS's burden alone. See Quevedo v. Ashcroft, 336 F.3d 39, 44 (1st Cir. 2003) ("Evidence from the government about changed country conditions does not automatically rebut the presumption."). That is so because these reports are not ordinarily tailored to the facts of any particular case. See id. ("[Country conditions] evidence is often general in nature and may not be an adequate response to an applicant's showing of specific personal danger."). Rather, they provide generic overviews of the geopolitical landscape in the removal country. See Palma-Mazariegos, 428 F.3d at 36; Fergiste v. I.N.S., 138 F.3d 14, 19 (1st Cir. 1998) (country conditions report discussed "political and social conditions in generalized terms"). And "abstract evidence of generalized changes in country conditions,

- 11 -

without more, cannot rebut a presumption of a well-founded fear of future persecution." Palma-Mazariegos, 428 F.3d at 35.

To rebut this presumption with a country conditions report alone, DHS must prove that the fundamental change conveyed in the report "negate[s] [the] petitioner's particular fear." Id. So, while "account[ing] . . . [for] the individual's particularized substantiated fear" typically demands more evidence than the state department's country conditions assessment provides, Chreng, 471 F.3d at 21, a report that "convincingly demonstrates material changes in country conditions" that themselves directly undercut the objective basis for the petitioner's presumptive fear "may be sufficient, in and of it itself," to support rebuttal of the presumption. Palma-Mazariegos, 428 F.3d at 36; see Waweru v. Gonzales, 437 F.3d 199, 203-05 (1st Cir. 2006) (finding generalized country conditions sufficient to rebut petitioner's presumption of well-founded fear of political persecution where persecuting government had been ousted from power with no reasonable likelihood of return). And where rebuttal is premised on particularized evidence from the report itself, "[s]uch focused evidence is to be distinguished from cursory statements or broad-brush generalizations about changed country conditions." Palma-Mazariegos, 428 F.3d at 36.

Because Mendez experienced past persecution on account of his political opposition to UNE,[5] the critical question here is whether the 2017 report demonstrates that conditions in Guatemala have changed such that expressing one's opposition to UNE is no longer an objective reason to fear persecution. Here, the BIA upheld the IJ's finding of changed country conditions based on two facts drawn from the 2017 report (and repeated in some cases in Mendez's testimony): (1) the diminution of UNE's power on the national level and (2) a peaceful transition of power following the 2015 elections. We review each fact drawn from the country conditions report in turn.

We begin with the IJ and BIA's reliance on UNE's changed political power in Guatemala. The BIA held that "[t]he record . . . establishes that Guatemala has had a peaceful transition of power and that the rival political party, [UNE], whom the respondent fears is no longer in power at the national level."[6] We disagree.

---

[5] Based on Mendez's credible testimony, the IJ found that Mendez had suffered past persecution on account of his opposition to "the corrupt political party in power in his region."

[6] The IJ noted -- in a comment adopted by the BIA -- that Mendez "testified that UNE is no longer in power as the majority party." However, the parties agree this statement is not reflected in the transcript, and we therefore do not credit it here. See Aguilar-De Guillen, 902 F.3d at 32. The IJ's statement likely was drawn from mishearing the following exchange:

[QUESTION] TO MR. MENDEZ ESTEBAN[:]

- 13 -

Unlike the BIA, we view the 2017 report to be inconclusive on UNE's power over political institutions in Guatemala following the 2015 elections. While the IJ and the BIA equated UNE's loss of the presidency in 2015 with "no longer [being] in power at the national level," we find no support for that inference in the record. The 2017 report contains no information about the political composition of the Guatemalan legislature or UNE's representation in regional and local governments.

Likewise, we find nothing in the record to suggest that UNE's loss of the presidency prevents UNE from persecuting its political opponents. To the contrary, Mendez credibly testified that UNE is the majority party in the country, is active in the region where Mendez lived, and is "on the elections" for the year 2020. Even the IJ recognized UNE's continued political influence in Guatemala in its analysis of Mendez's past persecution claim, noting that:

> The UNE party is not the majority party in Guatemala, correct?
>
> MR. MENDEZ ESTEBAN [RESPONSE:]
> I think now it is.

- 14 -

> UNE is a political party who does hold representation in the political scheme and structure of Guatemala. They have at times had majority power in the ruling party, and at times have had the leader -- the head of state of the country as a member of their party. Thus, regardless of the UNE's current representation and power structure, they are a political party capable of exerting the influence of the government. . . .

Given the record before us, we fail to see how the 2017 report's reference to UNE's loss of the presidency in 2015 supports the BIA's finding that political conditions in Guatemala have "fundamental[ly] change[d]" in a way that prevents UNE from persecuting its political opponents.

Nevertheless, even if UNE had become powerless on the national level, DHS still cannot satisfy its burden with the general statements about national politics untethered to Mendez's particular substantiated fear. Mendez's presumptive fear turns on UNE's power and influence at the local and regional levels of government. It follows that a generic statement about UNE's national profile, without more, lacks the requisite connection to Mendez's particular fear. See Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 24 (1st Cir. 2004). Such attempts at improperly equating a party's diminished posture on the national level to its influence on local politics is precisely what the particularized evidence requirement was intended to prevent. See Fergiste, 138 F.3d at 19.

- 15 -

Finally, in support of its conclusion that Guatemala had a peaceful transition of power after the 2015 election, the BIA cited to the 2017 report's statement that "[a]n Organization of American States international election observation mission characterized the [2015] elections as generally free and fair." But Mendez points out that the 2017 report does not define "generally free and fair," and therefore does not rule out occurrences of political violence or particularized persecution during the 2015 election.

We need not speculate about the scope of a "generally free and fair" election where DHS does not contest the IJ's conclusion that Mendez experienced political persecution while campaigning for the LIDER party in the lead up to the same Guatemalan elections described in the 2017 report. It therefore cannot be said that the 2017 report's assertion that the 2015 elections were "generally free and fair" evidences a fundamental change that negates Mendez's fear of political violence given that Mendez was persecuted for his political opinion around that time. Accordingly, we find the BIA's interpretation of the 2017 report's statement unsupported by substantial evidence.

Seeing no way to read the 2017 report as "convincingly demonstrat[ing] material changes in [political] conditions that affect the specific circumstances of [Mendez's] claim," Dahal v. Barr, 931 F.3d 15, 19 (1st Cir. 2019) (quoting

Palma-Mazariegos, 428 F.3d at 36), we find that the 2017 report, alone, is not substantial evidence that changed country conditions have eliminated the objective basis for Mendez's fear. Accordingly, the BIA's conclusion -- that since Mendez departed Guatemala in January 2015, fundamental changes to the conditions there have negated the objective basis for his particular fear -- is not supported by substantial evidence.

### ii. Mendez's Testimony

Apart from the 2017 report, the IJ and BIA also referred to the disbandment of LIDER and the lack of harm to Mendez's remaining family to bolster their conclusions that the conditions in Guatemala no longer support a presumption of fear. Mendez argues that these facts are of no legal significance to his claims and that the BIA's reliance constitutes legal error. We agree.

We begin with the disbandment of LIDER. The BIA considered LIDER's dissolution to be evidence "that the conditions in Guatemala [had] changed dramatically since [Mendez] departed in 2015." But Mendez presented the persecution he suffered in terms of his opposition to UNE, not his membership in LIDER. This formulation was adopted by the IJ, who held that Mendez had suffered past persecution on account of his "political opinion . . . against the corrupt political party in power in his region." We therefore fail to see how the disbandment of the LIDER party directly bears on the well-foundedness of Mendez's

- 17 -

fear of persecution at the hands of UNE -- particularly given Mendez's credible testimony that he may engage in public opposition to UNE if returned. Considering that DHS bears the burden to prove how changed conditions undermine Mendez's presumptive fear, we find that the fact of LIDER's disbandment is of insufficient consequence.[7]

We turn next to UNE's treatment of Mendez's family. The fact that members of Mendez's immediate family have continued to reside in Guatemala unharmed is inconsequential unless the record supports a finding that the lack of harm to Mendez's family in Guatemala -- either alone or combined with the content of the country conditions report -- undermines the particular basis for Mendez's presumptively well-founded fear. Having found nothing in the record to support such an inference, we conclude that the BIA erred.

In Mendez's case, the fact that UNE has not persecuted his family in Guatemala bears little on whether UNE would persecute Mendez himself if returned. Assertions about remaining family members are rarely probative as rebuttal evidence where, as here, a petitioner's fear is presumptively well-founded and it

---

[7] Mendez also contends that the BIA wrongly assumed the LIDER party had disbanded due to dwindling support or other internally driven factors. We need not reach this argument where the factual record on this question is sparse, and the formal status of LIDER in Guatemala bears little on our analysis.

is DHS's burden to prove otherwise.  See Dahal, 931 F.3d at 21 (finding lack of harm to petitioner's family after petitioner fled to be "of limited significance" to the calculus of whether changed circumstances had negated petitioner's particular fear).  Because of this burden shift, it is only when the record shows that a change in country conditions was accompanied by a corresponding change to the treatment of family members that this kind of information can favor rebuttal.  See Yatskin v. I.N.S., 255 F.3d 5, 10-11 (1st Cir. 2001) (considering lack of harm to remaining family in changed conditions calculus where "[a]fter testifying that his family had suffered retribution for his [anti-communist] political actions, [petitioner] admitted that they had not experienced any problems" since the fall of the Soviet Union).  Even then, it is "entitled to weight in the decisional calculus only where the family members are similarly situated" to the petitioner.  Morales-Morales v. Sessions, 857 F.3d 130, 134 n.1 (1st Cir. 2017) (cleaned up); see Nesimi v. Gonzales, 233 F. App'x 11, 14 (1st Cir. 2007) (per curiam) (unpublished decision) (finding safety of remaining family in Albania supported DHS's rebuttal burden where "a brother active in the same political party with which [petitioner] was involved" remained without persecution).

In other words, to be probative of whether circumstances have changed in relation to the petitioner's well-founded fear,

the family members must possess, or be otherwise associated with, the protected characteristic on account of which the petitioner was persecuted.[8] We see no such overlap here where the record contains no evidence that Mendez's family in Guatemala was politically active,[9] let alone openly expressing opposition to UNE. In light of this, the lack of harm to remaining family

---

[8] Unlike this case, nearly all the cases that DHS cites to in an attempt to counter this proposition lack findings of past persecution and, therefore, are reviewed under a framework where the noncitizen bore the burden of establishing a well-founded fear. See Cabas v. Holder, 695 F.3d 169 (1st Cir. 2012); Sihombing v. Holder, 581 F.3d 41 (1st Cir. 2009); Rashad v. Mukasey, 554 F.3d 1 (1st Cir. 2009); Touch v. Holder, 568 F.3d 32 (1st Cir. 2009); Jamal v. Mukasey, 531 F.3d 60 (1st Cir. 2008); Guzman v. I.N.S., 327 F.3d 11 (1st Cir. 2003); Chan v. Ashcroft, 93 F. App'x 247, 252(1st Cir. 2004) (unpublished decision). To the extent DHS cites to cases where this court -- in considering whether DHS met its rebuttal burden -- has relied on the safety of remaining family members without requiring evidence that those family members shared or were associated with the petitioner's political views, we do not find them persuasive.

First, those cases antecede our decision in Dahal, which clarified that the treatment of remaining family members is relevant to the rebuttal analysis only where the family members are similarly situated to the petitioner. 931 F.3d at 21. Second, even setting Dahal aside, where we have previously referred to the safety of remaining family members in this context, it has been to reinforce an independently supported finding of changed country conditions. See Hasan v. Holder, 673 F.3d 26 (1st Cir. 2012); Nesimi, 233 F. App'x at 14; Yatskin, 255 F.3d at 10-11. Accordingly, the experience of those family members was not given determinative weight.

[9] In fact, the only politically active family member Mendez referenced in his testimony was his brother-in-law, Armando, who had been campaigning with Mendez during the relevant incidents with UNE members. Armando's body was found with a gunshot wound to his chest in December 2014. Mendez testified that he believed UNE members had killed Armando.

should not have weighed into the BIA's assessment of whether conditions in Guatemala had changed in relation to Mendez's particular fear.

The BIA and IJ also considered that Mendez "has not been threatened since the last election and no one has contacted or threatened [his] family in Guatemala on his behalf since he fled the country in 2015" as further evidence that conditions underlying Mendez's fear had changed. But we find nothing in the record to suggest that UNE had the desire or ability to either contact Mendez in the United States or intimidate his family in Guatemala while he resided in the United States. And, regardless, where the burden rests with DHS to establish changed country conditions, Mendez need not make an affirmative showing that UNE continues to target him or his family while Mendez is residing in the United States. Accordingly, to the extent that the BIA relied on these facts, it did so in error.

To summarize, the 2017 report and the testimony from Mendez do not -- together or independently -- establish that changes in Guatemala have fundamentally altered the specific conditions that gave rise to Mendez's substantiated claim of political persecution. Accordingly, the BIA's conclusion that DHS rebutted Mendez's presumption of well-founded fear is not supported by substantial evidence. We therefore find Mendez statutorily eligible for asylum. See Fergiste, 138 F.3d at 19.

Because asylum is a discretionary form of relief, we remand to the agency for further proceedings before the IJ to determine whether to grant Mendez's qualifying application for asylum. See id. at 19-20.

## 2. Past Persecution - Particular Social Group

In his petition, Mendez also argues that the BIA erred in affirming the IJ's denial of his independent claim for asylum based on persecution for his membership in the particular social group of males of indigenous ancestry who are politically active in Guatemala. Having found Mendez statutorily eligible for asylum on political opinion grounds, we need not reach this issue.

## B. Withholding of Removal

Next, we turn to Mendez's alternative request for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3). To be entitled to withholding of removal, Mendez must establish that his "life or freedom would be threatened in [Guatemala] on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 1208.16(b). To meet this burden, Mendez "must demonstrate a 'clear probability' of persecution, which is a more stringent standard than the 'well-founded fear of persecution' that determines an applicant's eligibility for asylum." Dahal, 931 F.3d at 22 (quoting Fergiste, 138 F.3d at 20). But if a petitioner makes that showing, withholding of removal becomes mandatory unless the petitioner is

statutorily barred from the relief. I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 420 (1999); 8 U.S.C. § 1231(b)(3).

Here, Mendez's withholding claim mirrors his asylum claim. As with asylum, a finding of past persecution in the withholding context triggers a presumption of a clear probability that the applicant's "life or freedom would be threatened in the future," thereby entitling them to withholding of removal. 8 C.F.R. § 1208.16(b)(1)(i). "To rebut that presumption, [DHS] bears the burden to prove by a preponderance of the evidence that country conditions have changed such that it is no longer more likely than not that [Mendez]'s life or freedom would be threatened if he returned to [Guatemala]." Dahal, 931 F.3d at 22.

Given the IJ's unchallenged finding of past persecution, we presume that Mendez's life or freedom would be threatened if he were returned to Guatemala. And, for the reasons set out in our discussion of Mendez's asylum claim, DHS failed to meet its rebuttal burden. The evidence of changed country conditions put forth by DHS does not bear on the particular threats to Mendez's life or freedom that form the basis of his fear of return. Accordingly, based on the evidence before us, it appears Mendez has established he is entitled to withholding of removal. But because neither the IJ nor the BIA confronted the merits of Mendez's withholding claim -- having denied the claim only on the

- 23 -

erroneous conclusion that Mendez failed to make the less onerous showing required for asylum -- we vacate and remand to the IJ to assess the evidence in the first instance.

### C. CAT Relief

Finally, Mendez argues that the BIA's denial of his application for CAT protection is not supported by substantial evidence. To obtain relief under CAT, Mendez "must prove by objective evidence 'that it is more likely than not that he will be tortured if he is [removed].'" Id. at 23 (quoting Martinez v. Holder, 734 F.3d 105, 110 (1st Cir. 2013)). Here, the BIA, in affirming the IJ, concluded that Mendez failed to "establish[] through record evidence that it is more likely than not that he would be tortured by, or at the instigation of, or with the consent or acquiescence . . . of a public official in Guatemala upon his return." Mendez maintains that the BIA and IJ erred by finding his past persecution fell short of torture. We disagree with Mendez. The record shows that the past persecution Mendez suffered consisted of death threats, intimidation, and non-life-threatening physical violence. The BIA's conclusion that these harms fell short of torture is supported by substantial evidence. We therefore discern no error.

### V. Conclusion

For the foregoing reasons, we grant the petition for review as to Mendez's claims for asylum and withholding of

- 24 -

removal.    We deny the petition as to Mendez's claim for CAT protection.    We accordingly affirm the denial of Mendez's CAT claim, vacate the denials of Mendez's political opinion-based asylum and withholding of removal claims, and remand to the IJ for further proceedings consistent with this opinion.