# United States Court of Appeals
## For the First Circuit

No. 21-1665

ROSY KHANAL SINGH,

Petitioner,

v.

MERRICK B. GARLAND,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Montecalvo, Selya, and Thompson,
<u>Circuit Judges</u>.

<u>Steve Jeffrey Gutherz</u>, for petitioner.
<u>Yanal H. Yousef</u>, Trial Attorney, Office of Immigration Litigation, with whom <u>Brian Boynton</u>, Acting Assistant Attorney General, Civil Division, and <u>Sheri R. Glaser</u>, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

November 27, 2023

**MONTECALVO, Circuit Judge**. Petitioner Rosy Khanal Singh seeks review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial of her applications for asylum and withholding of removal. Singh sought these forms of relief based on claims that she experienced past persecution and had a well-founded fear of future persecution on account of political opinion and membership in a particular social group (her nuclear family). Before us, her challenges are limited to the agency's denial of her asylum and withholding of removal claims that were premised on alleged past persecution suffered in 2007 at the hands of Maoist insurgents in Nepal. Specifically, Singh contends that the agency erred in concluding that she failed to establish that the Nepali government was unwilling or unable to protect her. For the reasons that follow, we deny the petition.

## I. Background

Singh entered the United States in May 2012 on a B-1 temporary visa. She overstayed her visa, and in February 2016, the Department of Homeland Security ("DHS") issued Singh a Notice to Appear. Singh conceded removability and applied for asylum, withholding of removal, protection under the Convention Against Torture ("CAT"), and voluntary departure.[1] Her asylum and

_____

[1] The Immigration Judge ruled against Singh on her CAT claim, and Singh did not challenge this ruling before the BIA or

withholding of removal applications rested on claims of past persecution and a well-founded fear of future persecution at the hands of the Nepali Maoist party.

In November 2018, an Immigration Judge ("IJ") convened a hearing at which Singh testified and submitted documentary evidence for the IJ's review, including a declaration from her father-in-law, letters from the Nepali Congress Party ("NCP"), a police report, and news articles regarding violence in Nepal. At the hearing, the IJ, upon DHS's request and with counsel for Singh's consent, took judicial notice of the State Department's 2017 Country Conditions Report for Nepal. Although the IJ ultimately rejected Singh's asylum and withholding of removal applications, the IJ deemed Singh's testimony credible.

Singh's testimony before the IJ included the following account. In 2007, Singh lived with her husband, son, and husband's parents in Kapilvastu, Nepal. Her father-in-law was a prominent local member of the NCP. In September 2007, individuals associated with the Maoists -- an insurgent group that signed a peace agreement with the Nepali government in November 2006 marking the end of a 10-year civil war -- killed a prominent NCP leader in

---

before us. As such, her claim for protection under CAT is waived. See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004).

Kapilvastu.  Singh's husband spoke out against the Maoists for the killing.

About a month after the killing, a group of Maoists invaded Singh's home.  The Maoists tied up Singh's in-laws and beat her husband with the butt of a gun.  As a result, Singh's husband suffered a broken hand and bled from his head.  During the attack, one of the perpetrators also pushed Singh into the corner of a table, and she lost consciousness.

Luckily, a neighbor, who also was a former Nepali military officer, heard the commotion and notified the army.  Members of the army quickly arrived, and the group of Maoists fled.  Singh and her husband were treated for their injuries at a hospital.  Shortly after being discharged, Singh's husband fled to India, and Singh testified that she had not heard from him since November 2007.

About a week after the attack, Maoists kidnapped Singh's son while he was on his way home from school.  The Maoists held Singh's son for approximately two weeks.  Singh's father-in-law, NCP leaders, and a local resident associated with the Maoists negotiated with the Maoists and reached an agreement to secure her son's release.  In exchange for her son's release, Singh's family made two promises: (1) Singh's father-in-law would not express opposition to the Maoists; and (2) Singh and her family would

remain in the village.  The kidnappers also warned Singh not to report the incident to the police, and so she did not.

After these two incidents -- and despite her promise to remain in the village -- Singh and her son moved to live with her parents about one day's bus ride away from the village.  Singh remained there until she moved to the United States five years later on a B-1 visa.  About three years after that, her son joined her in the United States on a student visa.  Singh and her son had no further run-ins with the Maoists after they left Kapilvastu and moved in with her parents in Biratnagar.  However, Singh heard that the Maoists were still looking for them.  Singh's father-in-law remained politically active in Kapilvastu, and since 2007, he and Singh's mother-in-law have not experienced further harm.

The IJ granted Singh's application for voluntary departure but denied her claims for asylum, withholding of removal, and protection under the CAT.  The IJ denied the claims for asylum and withholding of removal on the basis that Singh failed to establish that she had experienced past persecution or had a well-founded fear of future persecution.  The IJ rejected Singh's claim of past persecution for two independent reasons.  First, the IJ found that the two October 2007 incidents -- the attack and the kidnapping -- "d[id] not rise above a series of isolated events" to the level of persecution.  Second, the IJ concluded that Singh

had not adduced sufficient evidence to establish that any harm was the result of the Nepali government's action or inaction. On this second point, the IJ stressed that the Nepali army responded promptly to the home invasion and Singh never notified the police of the kidnapping. As for Singh's claims premised on future persecution, the IJ found that Singh lacked the required well-founded fear because neither Singh nor her family had experienced any harm at the hands of the Maoists after 2007.

Singh appealed the IJ's decision to the BIA, which affirmed the IJ's decision. Regarding Singh's claims premised on past persecution, the BIA declined to reach the issue of whether the harm Singh suffered during October 2007 rose to the level of persecution and rested its affirmance solely on Singh's failure to establish that any persecution was by individuals that "the Nepali government was unable or unwilling to control." The BIA also identified no clear error in the IJ's implicit finding that Singh "suffered and fears harm from private actors, as opposed to government officials." And the BIA agreed with the IJ that Singh had not independently shown a well-founded fear of future persecution. Accordingly, the BIA affirmed the denial of Singh's asylum and withholding of removal applications and reinstated the period of voluntary departure.

Singh timely filed the present petition for review.

## II. Standard of Review

We review the "BIA's decision . . . as the agency's final decision and look to the IJ's decision only 'to the extent that the BIA deferred to or adopted the IJ's reasoning.'" Mendez v. Garland, 67 F.4th 474, 481 (1st Cir. 2023) (quoting Chavez v. Garland, 51 F.4th 424, 429 (1st Cir. 2022)); see also Bonilla v. Mukasey, 539 F.3d 72, 76 (1st Cir. 2008). In doing so, "[w]e examine the agency's findings of fact under the substantial evidence standard, upholding its factual findings so long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Murillo Morocho v. Garland, 80 F.4th 61, 65 (1st Cir. 2023) (quoting Sanabria Morales v. Barr, 967 F.3d 15, 19 (1st Cir. 2020)). In other words, the agency's factual findings must "be upheld unless a 'reasonable adjudicator would be compelled to conclude to the contrary.'" Orelien v. Gonzales, 467 F.3d 67, 70 (1st Cir. 2006) (quoting Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2004)). On the other hand, conclusions of law are reviewed de novo. Mendez, 67 F.4th at 481.

In our review, "[w]e confine ourselves to the reasoning relied on by the agency and will not affirm on other bases." Murillo Morocho, 80 F.4th at 65. And "we limit our review to those issues properly exhausted before the agency." Id.

## III. Discussion

To qualify for asylum, an applicant "must demonstrate either past persecution or a well-founded fear of future persecution on account of her race, religion, nationality, political opinion, or membership in a particular social group." Ortiz-Araniba v. Keisler, 505 F.3d 39, 41 (1st Cir. 2007) (citing 8 U.S.C. § 1158(b)(1)(B)(i)); see also 8 C.F.R. § 208.13(b)(1) (stating that establishment of past persecution on account of a protected ground creates a rebuttable presumption of well-founded fear of future persecution); Morales-Morales v. Sessions, 857 F.3d 130, 134 (1st Cir. 2017) (explaining that a non-citizen "who has suffered past persecution is presumed to have a well-founded fear of persecution and thus to be entitled to a grant of asylum" (citing Chen v. Lynch, 814 F.3d 40, 45 (1st Cir. 2016))). "Where a private actor, rather than the government itself, is alleged to be the persecutor, the applicant must demonstrate 'some connection' between the actions of the private actor and 'governmental action or inaction.'"[2]  Rosales Justo v. Sessions,

_____

[2]  The IJ determined that Singh failed to show that any alleged persecution "was the direct result of [g]overnment action, [g]overnment supported action[,] or the [g]overnment's unwillingness or inability to control private conduct." Although the IJ did not explicitly find that the Maoists who harmed Singh were private actors, rather than government actors, the BIA expressly upheld the IJ's "finding that [Singh] suffered and fears harm from private actors, as opposed to government officials" as

- 8 -

895 F.3d 154, 162 (1st Cir. 2018) (quoting Ortiz-Araniba, 505 F.3d at 41). Specifically, Singh had the burden of establishing "that the government was either 'unable or unwilling' to protect [her] from persecution." Id. (quoting Burbiene v. Holder, 568 F.3d 251, 255 (1st Cir. 2009)). For withholding of removal, an applicant must show the same requirements, but the burden of proof is even higher: she must prove "that it is more likely than not that she would face persecution on account of a protected ground if returned

---

not clearly erroneous. In so doing, the BIA cited Singh's testimony before the IJ regarding who attacked her and her family. In that cited portion of the testimony, Singh agreed that the people who attacked her "[were not] members of the [g]overnment." Before us, Singh does not argue that the IJ did not actually find that her attackers were private actors and that the BIA thus engaged in improper factfinding. Nor does she argue that the BIA erred in upholding the IJ's finding that the Maoists who attacked her were private actors, rather than government actors. Any argument that the IJ or BIA erred in treating her attackers as private actors rather than government actors is therefore waived. See Morales-Morales, 857 F.3d at 135 (explaining that "we may fairly deem [undeveloped] claim[s] abandoned" or waived).

To be sure, Singh makes several arguments regarding the Maoist party's control of the government in Nepal around the time of the 2007 incidents. But she makes those arguments under the theory that the government was "unable or unwilling" to control the private actors. In other words, those arguments are tied to Singh's contention that even though her attackers themselves may not have been government actors, the government was full of Maoists who embraced violence and thus was unable to protect her -- even if some members of the government affiliated with other parties may have been willing to protect her. Those arguments are thus separate from any argument for treating her attackers as government actors themselves -- the waived argument described above.

- 9 -

to her country." Pojoy-De León v. Barr, 984 F.3d 11, 18 (1st Cir. 2020).

Singh's primary contention of error before us concerns the agency's determination regarding her claims of past persecution and the government's willingness or ability to protect her at that time.[3]  Specifically, she argues that substantial evidence does not support the agency's findings that the harm Singh experienced was not perpetrated by actors whom the government was "unwilling or unable" to control.  In so doing, she asserts that the IJ should have taken judicial notice of the United States Department of State 2007 Human Rights Report for Nepal ("the 2007 Report") and that if the IJ had done so, the IJ would have been compelled to find that the Nepali government was unwilling or unable to protect her against Maoist insurgents.  Relatedly, Singh

---

[3]  Singh also argues that the harm she experienced in October 2007 did rise to the level of persecution (contrary to the IJ's decision that it did not).  But, as Singh recognizes elsewhere in her brief, this argument is not properly before us because the BIA did not consider this aspect of the IJ's decision.  See Chavez, 51 F.4th at 433 ("When the BIA does not consider an IJ's alternative ground for denying relief, that ground is not before us." (quoting Bonilla, 539 F.3d at 81-82)).

Additionally, Singh makes no argument in her briefing contesting the BIA's determination (agreeing with the IJ) that she failed to establish a well-founded fear of future persecution independent from any presumption based on past persecution.  Thus, we deem that claim waived and do not address it.  See Morales-Morales, 857 F.3d at 135.

further asserts that the IJ erroneously relied on a later Department of State 2017 Human Rights Report for Nepal ("the 2017 Report"), rather than the 2007 Report properly corresponding to the year of the alleged past persecution, in making the determination on the past persecution "unwilling or unable" issue.

We start by considering the latter two assertions regarding the Department of State reports. Contrary to Singh's counsel's contentions otherwise at oral argument, Singh never argued to the BIA that the IJ committed error by either (1) failing to take judicial notice of the 2007 Report, or (2) allegedly considering the 2017 Report (in place of the 2007 Report) when assessing the claims related to past persecution. Under principles of administrative exhaustion, "we consistently have held that arguments not made before the BIA may not make their debut in a petition for judicial review of the BIA's final order." Gomez-Abrego v. Garland, 26 F.4th 39, 47 (1st Cir. 2022) (internal quotation marks omitted) (quoting Ahmed v. Holder, 611 F.3d 90, 97 (1st Cir. 2010)). Thus, because Singh did not properly exhaust her arguments about the IJ's alleged error regarding the 2007 and 2017 Reports, we do not rule on those arguments here.[4]

---

[4] Even if these issues were properly presented to us following administrative exhaustion, we would reject Singh's contention that the IJ committed error in either of these ways. Singh did not file the 2007 Report before the IJ or at any time

Though she did not raise the arguments described above before the BIA, Singh filed an excerpt of the 2007 Report for the first time in her appeal to the BIA and suggested that the excerpt was relevant to the analysis of the government's action or inaction. Noting that the excerpt was not in "the record as constituted at the time of her hearing," the BIA nevertheless considered the excerpt and held it "does not demonstrate that the harm [Singh] described was perpetuated by either the government or by individuals or groups that the government is unable or unwilling to control." Because the BIA's consideration of the excerpt was proper[5] and our review is focused on the BIA's decision (reviewing

request that the IJ take judicial notice of that Report. Thus, the IJ did not err in failing to take judicial notice of the 2007 Report when it was never put before the IJ.

We would also reject the contention that the IJ committed error in the IJ's use of the 2017 Report. The IJ did take judicial notice of the 2017 Report, upon DHS's request at the hearing before the IJ and with counsel for Singh's consent. However, the IJ's decision only references the 2017 Report in its analysis of whether Singh had a well-founded fear of future persecution independent of any presumption based on past persecution. There is no indication in the IJ's decision that the IJ relied on the 2017 Report at all in assessing the past persecution claims regarding the 2007 events.

    [5]    The BIA's consideration of the 2007 Report excerpt despite its absence from the record before the IJ was permitted, though not required, under 8 C.F.R. § 1003.1(d)(3)(iv)(A). See Yang Zhao-Cheng v. Holder, 721 F.3d 25, 28 (1st Cir. 2013) ("[A]lthough the BIA is empowered to take administrative notice of commonly known facts such as current events or the contents of official documents, it is not compelled to do so." (internal quotation marks omitted) (quoting Kaihua Huang v. Holder, 312 F. App'x 420, 422 (2d Cir. 2009))); Jinbei Zhao v. Barr, 824 F. App'x

- 12 -

portions of the IJ's decision only to the extent that the BIA deferred to or adopted the IJ's reasoning), see Chavez, 51 F.4th at 429, we will consider the 2007 Report excerpt and the BIA's use of it in our analysis of the agency's "unwilling or unable" findings below.

We turn now to Singh's broader argument that the agency's "unwilling or unable" findings were not supported by substantial evidence. In order to demonstrate the required connection between the actions of the alleged private actor persecutors and governmental action or inaction, Singh "had the burden of proving that the government was either 'unwilling or unable' to protect [her] from persecution." Rosales Justo, 895 F.3d at 162 (citing Burbiene, 568 F.3d at 255). Though Singh had the burden to "prove either unwillingness or inability," she was not required to prove both to succeed on her claim. Id. at 163. As we have previously explained, "unwillingness and inability are distinct issues" and

_____

13, 14 (2d Cir. 2020) (finding that the "BIA properly took administrative notice of the U.S. State Department's 2004 Profile of Asylum Claims and Country Conditions" under 8 C.F.R. § 1003.1(d)(3)(iv) after the petitioner "submitted only limited evidence of country conditions at the time of her merits hearing" before the IJ). This regulation provides: "The [BIA] will not engage in factfinding in the course of deciding cases, except that the [BIA] may take administrative notice of facts that are not reasonably subject to dispute, such as . . . (2) The contents of official documents outside the record . . . ." 8 C.F.R. § 1003.1(d)(3)(iv)(A).

the "inquiry into whether there is a government nexus must include separate consideration of the evidence of unwillingness and the evidence of inability." Id. at 163, 164 n.8.

Here, the BIA's finding (upholding the IJ's determination below) that Singh "did not carry her burden to establish past persecution by individuals or groups the Nepali government was unable or unwilling to control" was supported by substantial evidence. In making this finding, the BIA first referenced the two facts cited by the IJ in this analysis: (1) that the Nepali army responded when a neighbor alerted them to the home invasion, and the Maoists fled; and (2) that Singh did not report the kidnapping incident to the police because she believed that "the consequences would not be good." Noting that "[o]n appeal, [Singh] does not challenge the Immigration Judge's finding regarding the government's ability or willingness to protect her from the Maoists based on the record as constituted at the time of her hearing," the BIA proceeded to consider the 2007 Report excerpt that Singh filed for the first time in her appeal to the BIA. The excerpt states that in 2007, Nepal was "operating under an interim political system: a parliamentary democracy with a powerless constitutional monarchy. Prime Minister Girija Prasad Koirala has a multiparty coalition government, which includes members of the Communist Party of Nepal-Maoist (CPN-M)." U.S. Dep't of State,

Bureau of Democracy, H.R. & Lab., Nepal 2007 (2008).  The excerpt also describes ongoing severe violence by Maoists in 2007 despite the peace agreement in 2006 and states that "[l]acking politica[l] backing, police were often reluctant to intervene [in armed attacks], particularly against the Maoists or . . . members [of the Maoists' subsidiary organization, YCL]." Id.  It also explains that generally in Nepal in 2007, "[i]mpunity for human rights violators . . . [was a] serious problem[]." Id.  The BIA found simply, without elaborating on its reasoning, that the 2007 Report excerpt "does not demonstrate that the harm [Singh] described was perpetuated by either the government or by individuals or groups that the government is unable or unwilling to control."

        In addition to the 2007 Report, before us, Singh points to a 2012 New York Times article that was part of her original evidentiary filing before the IJ in support of her argument that the government was unwilling or unable to protect her from her persecutors.  That article describes conditions generally in Nepal following the 2006 peace agreement, including government corruption and Maoists' and other groups' "street tactics" for inciting political protest involving violent acts.  Seyom Brown & Vanda Felbab-Brown, Nepal, on the Brink of Collapse, N.Y. Times (June 5, 2012).

On this record, substantial evidence supports the BIA's findings as to both the "unwilling" and "unable" analyses. The Nepali army's prompt response to the attack on Singh and her family in their home reasonably supports the government's willingness to take action to protect Singh from her Maoist persecutors under our prior caselaw. See, e.g., Ortiz-Araniba, 505 F.3d at 42 ("In determining whether a government is willing and able to control persecutors, we have explained that a prompt response by local authorities to prior incidents is 'the most telling datum.'" (quoting Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir. 2005))). In the face of this specific evidence of the army's willingness to intervene (and its actual intervention) to protect Singh, the more general contrary evidence from the 2007 Report's reference to Nepali police's reluctance to intervene against Maoist violence is insufficient to compel a different result than that reached by the BIA and the IJ on the willingness issue.

As to the separate analysis of the government's ability to offer protection, we have explained that prior efforts by the government to protect an asylum applicant from persecution that "proved fruitful" can support a finding that the government is able to offer an applicant protection. See Rosales Justo, 895 F.3d at 163-64 (first citing Khattak v. Holder, 704 F.3d 197, 206 (1st Cir. 2013); then citing Khan, 727 F.3d at 7-8; and then citing

- 16 -

Ortiz-Araniba, 505 F.3d at 42-43) (explaining that where a government's "willing efforts to protect its citizens fall short," an applicant may be able to prove inability without proving unwillingness, whereas in cases where evidence shows government efforts "proved fruitful," courts have found such evidence to support both government willingness and ability to offer protection). Here, the fact that the Maoist persecutors who invaded Singh's home fled when the army was called demonstrates "fruitful" action to protect Singh by the Nepali government.

Singh's failure to report the kidnapping incident to the police was also a proper consideration for the BIA and the IJ to raise in this analysis. The failure of a petitioner to report persecution to authorities "is not necessarily fatal to a petitioner's case if the petitioner can demonstrate that reporting private abuse to government authorities would have been futile." Morales-Morales, 857 F.3d at 135 (first citing Pavlova v. INS, 441 F.3d 82, 91 (2d Cir. 2006); and then citing Ornelas-Chavez v. Gonzales, 458 F.3d 1052, 1058 (9th Cir. 2006)); see also Ornelas-Chavez, 458 F.3d at 1058 (explaining that an applicant "need not have reported . . . persecution to the authorities if [they] can convincingly establish that doing so would have been futile or have subjected [them] to further abuse"). Singh argues that she did not report the kidnapping because she and her family were told

- 17 -

that if they did so, "the consequences would not be good."  Yet without more, the record below did not compel a conclusion that seeking government assistance would have been futile or subjected her to further abuse.

The 2007 Report excerpt's discussion of the Maoists' role in the government, Maoist violence and human rights violations, and impunity for human rights violations does weigh in Singh's favor.  These points raise questions about the government's ability to offer protection against Maoist persecutors.  And to a lesser extent, the suggestion of ongoing violence post-2006 related to Maoist activities in the 2012 New York Times article offers some support to this point as well.  However, under substantial evidence review, we cannot say that this evidence so overwhelms the direct evidence of the government's ability to respond effectually on behalf of Singh and her family against their Maoist persecutors -- causing the persecutors to flee during the home invasion -- that a reasonable adjudicator would be compelled to conclude that the government was unable to protect Singh.  See Ortiz-Araniba, 505 F.3d at 43 (finding that documentary evidence showing government inability to control the gang at issue "d[id] not compel a contrary conclusion" to the BIA's determination of government willingness and ability where the BIA considered and ruled based on "countervailing evidence [of] the government's

willingness and ability to prosecute and incarcerate particular gang members"). Thus, because substantial evidence supported the agency's findings that Singh failed to show that the government was either unwilling or unable to protect her from persecution, her challenge to the BIA's determination on her asylum claim fails.

Singh separately challenges the BIA's order denying her claim for withholding of removal. "But that claim not only requires the petitioners to satisfy the 'unwilling or unable' standard but also to do so under 'the even-more-demanding clear-probability test.'" Vila-Castro v. Garland, 77 F.4th 10, 15 (1st Cir. 2023) (quoting Morales-Morales, 857 F.3d at 136). This challenge therefore fails for the same reasons as her asylum challenge.

## IV. Conclusion

For the reasons stated above, we deny the petition for review.